883 F.Supp. 1565 (1995)
CONSOLIDATED RAIL CORPORATION, Plaintiff,
v.
The UNITED STATES of America, South-eastern Pennsylvania Transportation Authority, The Reading Company, National Railroad Passenger Corporation, City of Philadelphia, County of Bucks, County of Chester, County of Delaware, and County of Montgomery, Defendants.
General Panel Civ. A. No. 93-1.
Special Court, Regional Rail Reorganization Act of 1973.
April 4, 1995.
*1566 *1567 *1568 Laurence Z. Shiekman, David Richman, M. Duncan Grant, Pepper Hamilton & Sheetz, Philadelphia, PA, for plaintiff Consol. Rail Corp.
Timothy Burns, John Copeland Nagle, U.S. Dept. of Justice, Washington, DC, for defendant U.S.
Bonnie A. Barnett, David P. Bruton, Seamus C. Duffy, Drinker Biddle & Reath, Philadelphia, PA, for defendant Southeastern Pennsylvania Transp. Authority.
Daniel Segal, Hangley Aronchick Segal & Pudlin, Philadelphia, PA, for defendant Reading Co.
J. Brian Molloy, Douglas H. Green, Norman L. Rave, Jr., Piper & Marbury, Washington, DC, and Daniela Winkler, Dennis M. Moore, Amtrak Law Dept., Washington, DC, for defendant Nat. Railroad Passenger Corp.
Deseriee A. Kennedy, Robert A. Sutton, Asst. City Solicitors, City of Philadelphia, PA, for defendant City of Philadelphia.
Marilyn Heffley, Reed Smith Shaw & McClay, Philadelphia, PA, for defendant County of Bucks.
Jami Wintz McKeon, Martina Bernstein, Morgan Lewis & Bockius, Philadelphia, PA, for defendant Counties of Chester and Montgomery.
William F. Holsten II, Paola F. Tripodi, Holsten & White, Media, PA, for defendant County of Delaware.
Before WISDOM, Presiding Judge, GASCH and GREEN, Judges.
WISDOM, Presiding Judge:
This is the second case[1] in which the Special Court has been asked to examine the relationship between the statute that created the court, the Regional Rail Reorganization Act of 1973 (Rail Act),[2] and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA).[3] The plaintiff, Consolidated Rail Corporation (Conrail), and the defendants, National Railroad Passenger Corporation (Amtrak), and Southeastern Pennsylvania Transportation Authority (SEPTA), ask the Court to determine whether their CERCLA liability is limited by the Rail Act and its related statutes, the Final System Plan (FSP), and this Court's conveyance orders and documents accompanying those orders.
Conrail seeks a declaration of nonliability for acts of contamination which occurred before and after Conrail's involvement with the properties. Conrail also seeks indemnity from the United States and/or SEPTA for any cleanup costs attributable to the periods when Conrail operated commuter services on behalf of SEPTA. Conrail divides its claims into four distinct time periods based on the ownership and operation of the two sites at *1569 issue, the Paoli Railyard and the Reading Terminal, both located in Pennsylvania.
SEPTA, in response, has filed a counterclaim against Conrail for indemnity, as well as a cross-claim against the United States. Amtrak has also filed a counterclaim against Conrail contending it owes no liability for the acts of contamination which occurred before Amtrak had any connection with the properties. This case is before the Court on several motions for summary judgment.
Our opinion today resolves a number of issues. First, we hold that we do not have jurisdiction to resolve the current conflict between SEPTA and Conrail regarding their agreements entered into in accordance with the railroad legislation. Of the remaining claims, only Count I of Conrail's complaint is resolved in Conrail's favor. Counts II, III and IV are rejected for the reasons outlined below and the cross-motions for summary judgment are granted. The counterclaim pressed by Amtrak, analogous to Conrail's Count I, is resolved in Amtrak's favor. Finally, we do not decide SEPTA's cross-claim against the United States because, in the light of the resolution of other issues in this opinion, SEPTA's cross-claim is moot.

I.

Statutory background
In the early 1970's, several major railroads in the northeast region of the country filed for bankruptcy. In response to the ensuing crisis, Congress enacted the Rail Act and created the United States Railway Association (USRA), which it charged with the preparation of a plan to restructure rail service in the region. USRA's Final System Plan designated that certain properties would be transferred to and operated by the newly created Conrail in an attempt to create a "financially self-sustaining rail service system".[4]
Concerned that the abandonment of properties not included in the FSP would cause the abrupt and injurious cessation of commuter services in certain areas, Congress amended the Rail Act in 1975 with the Railroad Revitalization and Regulatory Reform Act (RRRR Act).[5] Under the RRRR Act, Conrail was required to continue rail service for 180 days after the properties were conveyed. Local transportation authorities were required to continue the existing level of financial support during this 180-day period. The United States supplemented this support by making funds available for costs not covered by the transit authorities, as well as "additional costs" incurred during the six month period.
After the statutory 180-day period, Conrail was not required to continue service unless the local transportation authority offered to continue financial support in accordance with the requirements of the Rail Act.

The Paoli Railyard[6]
The Paoli Railyard, located in Chester County, Pennsylvania, was owned and operated by Penn Central Transportation Company from 1915 to 1976. The Paoli Yard was included in the FSP and conveyed to Conrail on April 1, 1976. The property was immediately transferred to Amtrak, which still holds ownership of the property. Conrail, however, on behalf of the local transit authority, SEPTA, operated commuter services using the Paoli Yard from April 1, 1976 through December 31, 1982. Beginning the first day of 1983, SEPTA "began to operate its own commuter service and Conrail discontinued use of the Paoli Yard".[7]
Throughout operations by Penn Central, Conrail, and SEPTA, polychlorinated biphenyls (PCBs) were used at the Paoli Yard. These dangerous chemicals were released in and around the Paoli Yard and have caused contamination of local residential properties, *1570 including Valley Creek, located approximately half a mile from the yard.

The Reading Terminal[8]
The Reading Company owned and operated the Reading Terminal, located in Philadelphia, Pennsylvania, from 1893, the year of its construction, to April 1, 1976. On that date, Reading, pursuant to the FSP and the conveyance orders of this Court, transferred certain ownership interests to Conrail. These interests were immediately conveyed by Conrail to SEPTA. SEPTA received the remaining ownership interests directly from Reading. Conrail operated the Reading Terminal on behalf of SEPTA from April 1, 1976 through December 31, 1982. SEPTA then operated the terminal until November 1984 when all activity at the terminal ceased.
As with the Paoli Yard, all three successive operators, Reading, Conrail, and SEPTA, released PCBs during operations at the terminal.

The district court cases
In May 1985, six months after all activities ceased at the Reading terminal, the property reverted to Reading and Reading began cleanup operations. Reading then filed suit against SEPTA, Conrail, the City of Philadelphia, and four counties surrounding the property to recover costs incurred in removing the contamination from the Reading terminal.
As for the PCB contamination at the Paoli Yard, the United States brought a CERCLA enforcement action in 1986 against Conrail, SEPTA, and Amtrak. After some litigation, the United States secured permission also to proceed against the bankrupt Penn Central Railroad. The United States filed its enforcement suit against Penn Central in 1992.
In May 1993, Conrail filed its complaint in this court. In response, the U.S. District Court for the Eastern District of Pennsylvania stayed the proceedings in the Reading Terminal case pending the outcome of this case.

Summary of pleadings

Count I
Count I is limited to the time period before Conrail was created on April 1, 1976. Conrail seeks a declaratory judgment stating that the defendants cannot attempt to impose liability for any "pre-conveyance actions" by Reading or Penn Central. In seeking this judgment, Conrail relies on the Rail Act, the FSP, and this Court's Conveyance Orders.

Count II
Count II deals with the 180-day period between April 1, 1976 and September 27, 1976, during which Conrail, under Section 304(e)(1) of the Rail Act, operated the Reading terminal and the Paoli Railyard at the expense of the local transit authority, SEPTA, and the United States. Conrail, in reliance on the Rail Act, seeks a declaratory judgment stating that the United States and/or SEPTA must fully indemnify Conrail for any claims arising from actions or occurrences during that period. Further, Conrail presses an alternative claim for immunity.[9]

Count III
Count III deals with the period from September 28, 1976 through December 31, 1982 when Conrail operated commuter rail service on behalf of SEPTA under Section 304(e)(2) of the Rail Act. Conrail seeks the same relief it sought in Count II: a declaratory judgment that SEPTA and/or the United States should indemnify Conrail for any claims of personal injury or environmental cleanup costs attributable to this period of time. Again, Conrail relies on the subsidy obligations created by the Rail Act. In this count, Conrail alternatively bases its indemnity claim against SEPTA on three written agreements between Conrail and SEPTA. SEPTA counterclaims for indemnity from *1571 CERCLA liability based on the same three agreements. Plainly, SEPTA and Conrail disagree on the correct interpretation of the three private agreements. Conrail again presses an alternative claim for immunity.[10]

Count IV
Count IV relates to any liability attributable to the period after December 31, 1982 when Conrail ceased operating at both the Reading and Paoli locations. Conrail, in reliance on amendments to the Rail Passenger Service Act (RPSA)[11] made by the Northeast Rail Service Act of 1981 (NRSA),[12] requests a declaratory judgment barring the defendants from seeking to hold Conrail liable for any claims arising out of this period. Conrail also requests injunctive relief to support any judgment entered in answer to this or the other three counts.

II. Jurisdiction
Before considering the merits of Conrail's claims, this Court must determine whether it has jurisdiction to decide all the claims presented in Conrail's complaint, as well as the counterclaims and cross-claims asserted by the various defendants. The Special Court is a court of limited jurisdiction acting within the jurisdiction granted it by Congress. Section 209(e)(2) of the Rail Act provides in pertinent part:
The original and exclusive jurisdiction of the special court shall include any action, whether filed by an interested person or initiated by the special court itself, to interpret, alter, amend, modify, or implement any of the orders entered by such court pursuant to section 303(b) of this Act in order to effect the purposes of this Act or the goals of the final system plan....
This Court has long said that not every claim "relating to the Rail Act" is within our exclusive jurisdiction.[13] Rather, we have said, "this Court has exclusive jurisdiction where resolution of the dispute involves the court's central functions".[14]
Here, Conrail, in most of its claims, asks this Court to interpret the FSP, provisions of the Rail Act and NRSA, the Court's conveyance orders, and conveyance documents transferring ownership of rail properties designated by the FSP. Similarly, Amtrak's counterclaim against Conrail relies on the Rail Act and certain conveyance documents and SEPTA's cross-claim against the United States is based on a specific provision in the Rail Act. We have consistently held that the interpretation of conveyance orders, the FSP, the statutes creating the FSP, and conveyance documents is within our jurisdiction.[15] We hold, therefore, that we have jurisdiction under Section 209(e)(2) over Counts I, II and IV of Conrail's complaint, as well as the portion of Count III that relates specifically to a subsidy created by the Rail Act in Conrail's favor. Further, the Court *1572 has jurisdiction to decide Amtrak's counterclaim against Conrail and SEPTA's crossclaim against the United States since both are based specifically on the policies, purposes, and provisions of the FSP and the Rail Act.
The remaining claims, a portion of Conrail's Count III and SEPTA's counterclaim against Conrail, relate exclusively to three agreements entered between these two parties. The first agreement, signed April 4, 1977, is an operating agreement created pursuant to the Rail Act which was intended to govern the relationship between the parties, in conjunction with the Rail Act, while Conrail was operating commuter services on behalf of SEPTA. There is also a transfer agreement and a settlement agreement which were intended to govern the severance of the relationship between Conrail and SEPTA, as mandated by NRSA and the RPSA, and, as an attempt to resolve the conflicts remaining between them. Of the three agreements, the operating agreement has the closest ties to the Rail Act since it was created to effectuate the requirements of the Rail Act and the FSP.
Each party alleges that one or more of the contracts creates an indemnity obligation in the other which includes CERCLA liability. The operating agreement provides that SEPTA, as the subsidizer, will indemnify Conrail for all "liability costs." Liability costs are defined broadly to include "damage to property" and "injuries to persons." The settlement agreement, dated January 1, 1983, specifically provides that SEPTA "shall indemnify and hold Conrail harmless from any and all liability, including costs and reasonable attorneys' fees, arising out of environmental conditions at Paoli Shop or Paoli Yard." The transfer agreement, transferring the rail properties in 1982 from Conrail to SEPTA pursuant to NRSA and the RPSA, however, provides that Conrail shall indemnify SEPTA "against any and all liabilities, claims, charges, penalties, fines, forfeitures, and suits" for "any injury or damage to any person or property" or "contamination of the environment" that arises from the operations of the rail properties by Conrail. SEPTA bases its counterclaim for indemnification against Conrail on the transfer agreement while Conrail seeks to enforce the indemnity obligation it argues was created by the operating agreement.
Each agreement begins by citing either the Rail Act or NRSA and by asserting that the agreement was created "pursuant" to these statutes. Merely citing the statutes which create and govern this Court, however, has no talismanic power to create jurisdiction when Section 209(e)(2) is silent on the subject. We must, therefore, determine whether the jurisdiction granted by Section 209(e)(2) extends to the interpretation of these private contracts.
Conrail relies on this Court's decision in Consolidated Rail Corporation v. Pittsburgh & Lake Erie Railroad Company[16] as support for its assertion that the Special Court has jurisdiction to resolve Conrail and SEPTA's dispute over the three agreements and the resulting indemnity obligation. In Pittsburgh & Lake Erie, this Court was asked to determine the extent of trackage rights designated by the FSP and granted in conveyance documents prepared pursuant to this Court's conveyance order. These trackage rights were memorialized in an agreement between Conrail and Pittsburgh & Lake Erie.[17] After reviewing the jurisdictional grant of Section 209(e)(2) and its legislative history, this Court concluded that it did have jurisdiction to interpret the agreement along with the FSP designations and the conveyance order.[18] We recognized that the interpretation of agreements entered into pursuant to a conveyance order did not appear to be within our jurisdiction on the face of Section 209(e)(2). We held, however, that
[i]t suffices to sustain our jurisdiction here that ConRail's complaint raises substantial questions with respect to the interpretation of the FSP and our conveyance orders themselves and not merely of the operating *1573 rights grant and the implementing agreement.[19]
In other words, jurisdiction was present since the issues relating to the private agreement raised the same questions of interpretation as the issues relating to the FSP designations and the conveyance order. This Court, however, referring to a proposed broader grant of jurisdiction which was not adopted by Congress, noted that not all claims seeking interpretation of agreements executed pursuant to the FSP would be within our jurisdiction:
On the other hand, a reading of § 209(e)(2) that would give us original and exclusive jurisdiction to determine every controversy that may arise over the interpretation of the thousands of instruments executed pursuant to our conveyance orders would seem to run counter to the desire of the Conference Committee to confine us to our `central functions', and to render its paring down of § 209(e)(1) as contained in the Senate and House bills somewhat an exercise in futility.[20]
Thus, we limited our conclusion that there was jurisdiction over the private agreement to cases in which interpreting a private agreement would relate directly to interpreting the FSP and the conveyance orders.
The interpretative issues before us in Count III of Conrail's complaint and in SEPTA's counterclaim do not have this direct link to this Court's traditional areas of jurisdiction. At their base, the claims seek interpretation of the three agreements and the imposition of an indemnity obligation based on the intent of the parties as expressed through the agreements. Only one of the three agreements, the operating agreement, can be tied directly to the provisions of the Rail Act. Also, since the contracts are in conflict, Conrail relies on accepted principles of contract interpretation to allege that the indemnity obligation created by the agreements is in its favor. SEPTA, in response, also relies on basic principles of contract interpretation but also alleges several defenses including contract breach, failure of consideration, commercial impracticability, and mutual mistake. Many of the allegations and counter-allegations made by the parties rely on Pennsylvania contract law to resolve the dispute.
In the light of the nature of these claims, we cannot agree with Conrail's contention that our jurisdiction can be based on an analysis similar to the one conducted in the Pittsburgh & Lake Erie case. That analysis created an exception to the general rule that this Court does not have jurisdiction to resolve contract disputes that arise in the wake of the FSP. The contract claims before us today are not within that exception. Therefore, we hold that this Court cannot resolve the indemnity controversy between SEPTA and Conrail because it falls outside the jurisdiction granted to it by Congress in Section 209(e)(2).
This conclusion finds support in our other jurisdictional decisions. In Consolidated Rail Corporation v. Penn Central Corporation,[21] this Court concluded that its jurisdiction included the authority to interpret conveyance documents.[22] We cited the Pittsburgh & Lake Erie decision for support but noted, as to that holding, that "[o]f course, we do not suggest that every contract claim that `bear[s] a relation to the Act' is within our exclusive jurisdiction ... [I]f a claim arose implicating solely issues of contract law ... we might be without jurisdiction".[23] Similarly, in Consolidated Rail Corporation v. Dicello, while interpreting language in a conveyance document, we refused to answer the question of whether a private agreement granted a local railroad certain operational rights.[24] We held that the issue relating to the agreement was "a question of contract interpretation" that was outside our jurisdiction.[25]
*1574 Further support is found in Stratford Land and Improvement Company, Inc. v. Blanchette.[26] In Stratford, this Court was asked to determine whether a pre-conveyance contract remained with Penn Central or was transferred to Conrail and, in either event, what payment obligations were still owed under the contract.[27] The Special Court determined that the contract at issue remained with Penn Central despite substantial conveyances to Conrail but refused to make any determinations regarding what obligations the agreement imposed.[28] We concluded that those issues were "solely a matter of interpretation of the agreement" between Penn Central and the plaintiff, a local company.[29] Accordingly, we declined to resolve these issues since "[s]uch questions do not fall within the compass of § 209(e)(2) or any of the other provisions of § 209(e)".[30]
We also refused Stratford's request to decide the entire case, including the contract claims, based on the doctrine of ancillary jurisdiction because we concluded that the plaintiff would receive a "surer-footed" interpretation of the agreement in another forum.[31] Furthermore, we noted that the interests of uniformity would not be served by deciding the issues since the Rail Act was only "tangentially implicated" by the plaintiff's contract claim.[32]
We hold, therefore, that this Court does not have jurisdiction to resolve the contract dispute between Conrail and SEPTA. We do note, however, that a determination of the parties' intent should be informed by the policies and provisions of the Rail Act, NRSA, and the FSP. In other words, to resolve these conflicting agreements, it will be necessary for the interpreting court to understand the setting in which the contracts were created.
As we noted in our recent decision in Penn Central v. United States, "[t]his Court is the final arbiter of the correct interpretation of the conveyance documents, Rail Act, and FSP.... We do not conduct conventional trials. Our rules and procedures are, in many respects, unique".[33] In light of the substantial questions of contract law and CERCLA liability raised as to these three agreements, we are confident that the dispute can be more appropriately resolved in a more traditional forum.

III. Mootness
In the case before us, the County of Delaware, one of the several defendants, has made a motion to dismiss, alleging that Conrail's claims against it have been mooted by events in the Reading Terminal case currently stayed in the Pennsylvania District Court. Basically, the County of Delaware argues that, since the district court in that case granted its motion for summary judgment on claims by Reading that the County of Delaware was liable for a portion of the cleanup costs of the Reading Terminal under CERCLA, any similar claims by Conrail are now moot. The County of Delaware argues that, since Reading's claims against it were dismissed, the County of Delaware "would have no reason to pursue a cross-claim for contribution or indemnity against plaintiff Conrail".[34]
Conrail responds by stating that, although summary judgment was granted on Reading's claims against the County of Delaware, there has been no resolution of the alleged cross-claims against the County of Delaware by Conrail and other co-defendants in that case. Furthermore, Conrail argues, the decision by the Pennsylvania District Court to grant summary judgment is "subject to revision" at any time under Federal Rule of Civil Procedure 54(b) since only a portion of the claims in that case were decided.
Article III of the U.S. Constitution imposes certain threshold requirements on federal *1575 jurisdiction. One important requirement is that there be an actual dispute or an actual "case or controversy" between the litigants. This limit on the jurisdiction of federal courts is intended to prevent the issuance of advisory opinions. When there is no actual controversy, or the case is moot, a federal court is without the power to decide the case.
To determine whether a case is "live" or moot the court must consider the interests of the parties and the possibility for meaningful relief. Although there is no precise test for mootness, courts have identified three important elements: "(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy with sufficiently adverse parties so as to sharpen the issues for judicial resolution".[35]
In the case of equitable relief, "[b]asically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment".[36] Before a declaratory judgment can be issued, it must be determined that the feared harm is not merely a contingency but that the likelihood of that future event occurring is "real and substantial".[37]
In the motion before us, the County of Delaware seems to allege that its liability in this matter has already been determined. However, that determination was made as to Reading's claims and not the claims presented here by Conrail. Furthermore, as noted by Conrail, that determination is not a final judgment and is still subject to change.[38] The County of Delaware, as the moving party, bears the burden of showing that dismissal is appropriate. As has been noted by many courts, a litigant seeking to show that a case is moot "must bear a heavy burden of demonstrating the facts underlying that contention".[39] The County of Delaware has failed to make that showing here. Accordingly, its motion to dismiss is DENIED.

IV. The Merits of Conrail's claims[40]

A. Count I: the pre-conveyance period[41]
Conrail contends that it is not responsible for any environmental clean up costs attributable to the period before the conveyance of both the Reading Terminal and the Paoli Yard in 1976. Since resolution of this claim is controlled by this Court's recent decision *1576 involving an almost identical claim in Penn Central Corporation v. United States,[42] a detailed discussion of the conclusions in that case is appropriate.
A substantial portion of the Penn Central Corporation v. United States opinion answered Conrail, Amtrak, and SEPTA's contentions that they could not be held liable for cleanup costs attributable to acts before the transfer of railroad properties under the FSP, on April 1, 1976. The railroad defendants in Penn Central (Conrail, SEPTA, and Amtrak) alleged several grounds for nonliability, including the Rail Act's "fresh start policy". The railroad defendants also cited the "free and clear" provision of Section 303(b)(2) of the Rail Act and the "other charge" clause of the conveyance order. Finally, the railroad defendants pointed to language in the conveyance deeds which suggested no assumption of obligations or liability for pre-conveyance acts.
This Court, after a close examination of the Rail Act and its legislative history, held that CERCLA overcame the fresh start policy embodied in the Rail Act and that the fresh start policy, by itself, could not shield the railroad defendants from CERCLA liability.[43] Furthermore, this Court held that nothing in the provisions of the Rail Act or in the language of the conveyance order precluded CERCLA liability.[44] The Court, however, agreed with the railroad defendants' claim that the "assumes no obligation" language in the conveyance deeds was intended to limit the liability of the transferee railroads.[45] We concluded that the conveyance deeds, combined with the Rail Act's fresh start policy, precluded the imposition of liability for pre-conveyance acts on transferee railroads having only post-conveyance connections to the properties. In other words, Conrail, SEPTA, and Amtrak could not be held liable under CERCLA for acts of contamination which occurred before they owned or operated the property.
As outlined by this Court, however, unless a reasonable means of apportionment is found, under CERCLA, each defendant is jointly and severally liable.[46] We did recommend that an apportionment basis be found which considered the involvement of each party with the property and its contamination. This Court, however, left it to the district court in which a CERCLA action was pending to receive the detailed evidence necessary to make a finding on the feasibility and appropriate basis for apportioning the CERCLA liability.[47]
Thus, our decision regarding the correct interpretation of the conveyance deeds and the Rail Act resolved only a portion of the issues in the Penn Central case which required resolution before CERCLA liability could be apportioned. We rejected the claims of the railroad defendants that the dates of the operational history of the site alone offered a "bright line" method for dividing liability. As we noted, while relevant, "time periods of operation are but one factor to be considered"[48] in apportioning CERCLA liability.
In the case before us, Conrail attempts to rely on the same statutes and documents to argue, in Count I of its complaint, that it is liable for neither the pre-conveyance acts of Reading as to the Reading terminal nor the pre-conveyance acts of Penn Central Transportation as to the Paoli Railyard. In both cases, conveyance deeds identical with the one analyzed by this Court in the Penn Central case were used to transfer the properties to Conrail pursuant to the FSP.[49] *1577 Therefore, according to the precedent created by this Court's decision in Penn Central, Conrail should not be held liable under CERCLA for the pre-conveyance acts of either Reading or Penn Central. As noted in Penn Central, the deeds at issue:
were drawn with the intent to give the railroads a clean slate as of the date that they took the yards. That policy cannot insulate them from their responsibility for contaminating the yards, but it certainly indicates that they should not be responsible for the contamination that came before them.[50]
Accordingly, we grant Conrail's motion for summary judgment and hold, pursuant to our decision in Penn Central, that the conveyance deeds were intended to limit Conrail's exposure to liability for post-conveyance acts only. As we found in Penn Central, however, this decision may be of little consequence in the light of the very real possibility of joint and several liability under CERCLA.
Under CERCLA, joint and several liability is not automatic.[51] Rather, Congress left it to the discretion of federal courts, with the aid of common law tort principles, to apportion liability where a reasonable basis exists.[52] There are two possible methods of apportionment: first, where there are two distinct harms, and second, where there is a reasonable basis for dividing one harm. In this case, there is currently one harm to be remedied at two separate sites, in two separate CERCLA cases in district court. The issue to be resolved is whether that one harm can be reasonably divided. Conrail, like the railroad defendants in the Penn Central case, suggests temporal divisions based on the dates each party operated rail services at the Reading Terminal or the Paoli Yard. Conrail argues that the time divisions created by the Rail Act and successive legislation are actually statutory divisions of liability.
This Court rejected that argument in Penn Central and we reject it again in this case. The history of operation at each site, even though such operations were statutorily controlled by the Rail Act and successive legislation, does not resolve whether CERCLA liability as to these sites can be apportioned, nor does it offer a definitive method for division. These dates do offer an important factor to be considered in making apportionment decisions, especially in the light of our holding today that the conveyance deeds were intended to specifically limit the liability of successive operators. We cannot, however, divide CERCLA liability based on these dates alone. Detailed evidence of the nature of the contamination is necessary before any final division of liability can be made.
The next issue to be resolved is which forum is the most appropriate for the resolution of these issues. This Court has previously concluded that a district court is the best forum for the apportionment determination:
Federal district courts ... are well-versed in receiving complicated evidence and testimony. Given that they are the tribunals that will ultimately hear the CERCLA claims themselves, they are better situated to receive the evidence that will affect those determinations. In sum, we conclude that the district courts hearing the CERCLA claims are the proper fora to analyze evidence on the degree of contamination and the number of toxic and hazardous chemicals released. The decision whether to impose joint and several liability is theirs.[53]
As emphasized earlier, we are a court of limited jurisdiction. Section 209 grants this Court jurisdiction to resolve issues flowing from the Rail Act, the FSP, and conveyances *1578 made pursuant thereto. Decisions regarding strictly issues of CERCLA liability are outside our province. Even beyond our jurisdictional limit, it is in the best interests of the litigants to encourage them to seek resolution of their claims in a forum better equipped to receive the complicated evidence necessary to divide CERCLA liability. Therefore, we hold, as we did in Penn Central, that the district courts are the appropriate fora to resolve the apportionment issues. We are confident that the district courts that resolve these cases will fully and fairly consider our holding today regarding the liability limit contained in the conveyance deeds.
Recently, both SEPTA and Conrail have urged one final argument regarding the division of CERCLA liability. The litigants rely on a Virginia district court case,[54]Chesapeake and Potomac Telephone Co. v. Peck Iron & Metal, to argue that this Court, while leaving the basic issues of apportionment to the district courts, should make an initial liability division between Reading, as the plaintiff in the Reading terminal case, and the defendants in that district court case. SEPTA and Conrail argue that Reading, as one of the contaminators, should not be allowed to obtain a joint and several judgment against the defendants. They contend that this division, which would remove or reduce the burden on SEPTA and Conrail of proving a reasonable basis for apportionment, is mandated by the Rail Act and its fresh start policy.
We reject their argument. While we agree that the approach of the Peck Iron court appears to us to be a logical, equitable approach, it is one among several.[55] Neither the Rail Act nor the fresh start policy mandates such an initial liability division by this Court. Accordingly, we have no basis upon which to limit the district court in its choice of approaches. The district court is the appropriate forum in which to present the detailed evidence necessary to divide liability and then, based on that evidence, to determine the method of apportionment.
In enacting CERCLA, Congress chose not to create a statutory mandate for joint and several liability. Implicit in the deletion of the original provision for joint and several liability was Congress' wish that the liability decision be made after an in-depth factual analysis of the individual case. In other words:
... [T]he term was omitted in order to have the scope of liability determined under common law principles, where a court performing a case by case evaluation of the complex factual scenarios associated with multiple-generator waste sites will assess the propriety of applying joint and several liability on an individual basis.[56]
Thus, we leave it to the district court to determine whether the Peck Iron approach is the appropriate manner in which to proceed in this case.
As a final note, we reiterate our holding that the conveyance deeds which transferred these properties to Conrail did limit Conrail's liability to post-conveyance acts. Thus, any division of liability as to these two sites must take into consideration the intent expressed *1579 in the conveyance documents, as well as the general fresh start policy of the Rail Act.

B. Count II and Count III: Conrail as Operator of Commuter Services for SEPTA
In Count II of its complaint, Conrail argues that it cannot be held liable for actions taken during the 180-day post-conveyance period since the Rail Act required it to continue service until local transit authorities could determine whether continuation of commuter services at particular properties was desirable. Under the Rail Act, Conrail was to continue service and this service was to be subsidized by local transit authorities as it was before the rail property was conveyed.[57] If this subsidy did not cover all costs, the United States became responsible to Conrail for "any loss which is incurred by it during the 180-day mandatory operation period ... which is not compensated for by a State (or local or regional transportation authority)".[58] Conrail relies on these subsidies to argue that SEPTA, or, alternatively, the United States, owes it an indemnity obligation for CERCLA liability attributable to that time period as it represents an additional cost or "loss" resulting from the operations of commuter services during the 180-day period.
In Count III of its complaint, Conrail seeks equitable relief similar to that sought in Count II: a declaratory judgment that SEPTA, or, in the alternative, the United States, is obligated to indemnify Conrail for CERCLA liability. Conrail argues that the Rail Act's requirement in Section 304(e), that local transit authorities, like SEPTA, offer a continuation payment to continue commuter services after the 180-day period, can also be translated into an indemnity obligation in Conrail's favor which includes all CERCLA liability for the period between April 1, 1976 through December 31, 1982.
Both SEPTA and the United States respond by arguing that these subsidies were intended to reimburse Conrail for regular operational costs and were not intended to indemnify it for liability for environmental damage. Furthermore, SEPTA argues that, as to Count II, under the Rail Act, it was only required to provide the same financial support present before the conveyance. Any additional costs for losses are the responsibility of the United States.
Although several issues regarding both the nature and limited scope of any duty to reimburse Conrail have been raised, we must first address whether a right of action to enforce what Conrail describes as an indemnity obligation exists.
The provisions of the Rail Act set up a system by which Conrail was required to continue commuter services, with the combined financial support of the United States and SEPTA, for a six-month transition period. After six months, local transit authorities were required to offer Conrail a continuation payment which met the coverage standards promulgated by the Rail Services Planning Office (RSPO) of the Interstate Commerce Commission, otherwise Conrail was authorized to discontinue service. If the appropriate continuation payment was offered, however, Conrail was required by Section 304(e)(2) of the Rail Act to continue commuter operations. The RSPO recommended that the relationship thereby created between Conrail and local transit authorities be further explored and defined through the negotiation and signing of an agreement.
None of the provisions of the Rail Act expressly creates an independently enforceable right of action for indemnity. According to the RSPO standards, all conflicts were to be resolved either through good faith negotiations by the parties or by the RSPO's limited intervention in the form of mediation.[59] *1580 Thus, before we allow Conrail to proceed on their claims to enforce the alleged obligations of indemnity, we must decide whether the Rail Act impliedly grants such a right of action.
To aid us in the inquiry whether an indemnity right of action can be implied from the Rail Act, there is ample Supreme Court precedent. In Cort v. Ash,[60] the Supreme Court first outlined the test for determining whether a right of action can be implied from a statute. The core inquiry is always legislative intent.[61] The first source is, of course, the language of the statute itself but there are also, according to the Supreme Court, other factors to be considered. These factors include: the legislative history and purposes of the statute, whether the statute was enacted for the special benefit of a class of which the plaintiff is a member, and the existence of a comprehensive remedial scheme designed to resolve conflicts arising out of the statute.[62] Each of these factors will be discussed in turn.
The text of the Rail Act offers little guidance on this issue. Only two provisions other than the provisions that create the subsidies refer to them and neither supports implying a right of action for indemnity. Section 304(e)(5)(C) of the Rail Act provides that the term "loss" in Section 304(e)(5)(A), which creates the subsidy obligation of the United States, includes losses suffered in the actual movement of trains as well as costs incurred "to maintain service, meet on-time performance, and maintain a reasonable degree of passenger comfort". In this way, Congress encouraged Conrail to maintain properly and, if necessary, to upgrade its commuter facilities.[63] There is nothing in this definition which indicates the subsidy was intended to include liability for environmental damage or that the subsidy obligation was enforceable through an action for indemnity. In fact, the perceived necessity to define "loss" as including necessary maintenance and upgrades indicates that the subsidy was perceived as a narrow and limited obligation.
Furthermore, both SEPTA and the United States cite Section 304(e)(8) which instructs the Secretary of Transportation to undertake a study of the most appropriate method for the possible reimbursement of Conrail for liability incurred as a result of damages to persons or property in the operation of commuter services. This provision indicates that Congress contemplated that Conrail would, in fact, incur such liability despite its role as mere operator on behalf of SEPTA. At the conclusion of this study "the Secretary found that `... the best means for compensating Conrail for the liability it may incur is through Conrail's acquisition of increased insurance levels.' The Secretary indicated that additional insurance was available and that `a Federal solution to this problem is not warranted at this time'".[64] Thus, despite the opportunity to study the problem, Congress took no formal action to shield Conrail from liability.[65] Rather, Congress simply relied on *1581 the existing RSPO Commuter Standards to resolve any conflicts that arose.[66] As specifically concluded by this Court in our recent Penn Central decision, liability for pollution of or damage to the environment "simply was of no moment to Congress" at the time the Rail Act was created.
The primary purpose of the Rail Act was to create an economically stable, self-sustaining rail system. While this was accomplished by mandating a relationship among Conrail, SEPTA, and the United States, it was certainly not enacted for the benefit of Conrail. Rather, it was enacted to prevent the cessation of critical rail services in this country. Accordingly, Conrail cannot argue that implying a right of action for indemnity, as a benefit to Conrail, would profit the class the statute was originally intended to benefit. Thus, an examination of the purposes of the Rail Act does not support implying a right of action for indemnity in Conrail's favor.
Furthermore, there is no evidence in the legislative history of the Rail Act which created these subsidies that a right of action for indemnity is available to Conrail. By 1976, all Class I railroads in the Northeast and Midwest were bankrupt and, the Congressional focus was on the impending national economic disaster if rail services by the bankrupt railroads were to stop. The creation of Conrail and its commuter service obligation to local transit authorities was merely the method by which Congress accomplished one of its goals. As stated in the legislative history to the Rail Act's declaration of policy provision, Section 101,
Congress finds that the public convenience and necessity requires adequate and efficient rail service in this region [the Midwest and Northeast] and throughout the Nation; that rail service and rail transportation offer advantages over other modes of transportation in terms of land use, air pollution, noise levels, energy efficiency and conservation, resource allocation, safety, and cost per ton mile of movement and therefore must be preserved and improved; and that these needs cannot be met without substantial action by the federal government.[67]
Thus, the legislative history to the Act and its amendments in 1975 do not offer support for Conrail's claimed right of action.
Conrail also attempts to rely on the Commuter Standards and other rulings issued by the RPSO to support its indemnity claim. Those regulations and rulings, however, actually support a finding that the Rail Act grants Conrail no right of action. According to the RSPO standards, general liability for damage to property and persons is the responsibility of the subsidizer.[68] This conclusion was reaffirmed when SEPTA requested a rulemaking on the issue.[69] The RSPO stated:
In essence, RSPO has been unable to find any reference or indication that Congress intended that liability expenses be treated in a manner different from other solely related costs.... Consequently, RSPO finds no substance in SEPTA's contention that Congress intended Conrail to share in or bear liability costs for the operation of the commuter service.[70]
The existence of these regulations in Conrail's favor, however, does not necessitate a finding that Conrail can enforce the standards *1582 through an action for indemnity. In fact, the RSPO regulations and decisions have already created a remedial scheme to resolve the types of conflicts currently before us. As noted by the Supreme Court, the existence of a remedial plan supports not implying a right of action.[71]
The standards required Conrail and SEPTA to enter a subsidy agreement as soon as possible.[72] The agreement was intended as a more detailed portrait of the subsidy relationship. If conflict arose, the RSPO was available to mediate.[73] Only if an agreement could not be reached would the guidelines for cost apportionment under the commuter standards apply.[74] Before their application, however, each party had the right to request a special study of the problem.[75] The emphasis, however, was on individualized subsidy agreements entered after good faith negotiations. As stated by the RSPO:
The commuter subsidy standards are guidelines which permit the subsidized and the railroad to establish a relationship uniquely suitable to them. The parties are not required to adhere inflexibly to RSPO rules. To the contrary the emphasis in the commuter standards ... is on arm's-length, good faith negotiations.... The Office will assist in resolving disputes through mediation. It is only when these efforts fail that the apportionment formulae come into play.... The Office believes that these flexible (but fail-safe) procedures are more likely to produce reasonable and equitable agreements and practices than would mandatory regulations.[76]
Thus, the RSPO created a set of procedures through which the parties to the subsidy could seek a remedy in the event of conflict. We cannot today alter that remedial plan by implying a right of action for indemnity from the provisions of the Rail Act which create the subsidies. There is nothing in the text of the Act or its legislative history to support Conrail's asserted right of action. Further, none of the other factors articulated by the Supreme Court suggest implying this right. Therefore, we hold that Conrail is not granted a right of action for indemnity and cannot now press these claims.
In creating this subsidy relationship, the Act and the attendant regulations leave many blanks to be filled in by the parties. Here, Conrail and SEPTA have done exactly that by entering three separate and detailed agreements. These agreements do address liability for environmental damage, although the parties disagree as to which claim for indemnity the agreements support. We have already decided that deciphering the overlapping provisions of the private contracts is outside the jurisdiction granted us by Congress. The remedy now available to Conrail is to seek interpretation of these agreements in the proper forum.
Finally, Conrail alternatively seeks a declaratory judgment that it is immune from CERCLA liability attributable to the period of time it operated commuter services on behalf of SEPTA. Originally, Conrail sought summary judgment on this issue but has since dropped this motion. The defendants, the United States, Amtrak, and Reading, maintain their cross-motions for summary judgment.
We find no support for Conrail's claim. CERCLA firmly states that it applies "notwithstanding any other provisions or rule of law".[77] Conrail has pointed to no Rail Act provision which supports its immunity claim, especially in the light of the broad applicability Congress gave CERCLA. We simply cannot imply immunity from CERCLA liability for Conrail when Congress clearly intended *1583 CERCLA to apply to anyone connected with contamination, regardless of fault, and, in many cases, in the form of joint and several liability so that one party may be responsible for all of the cleanup costs, regardless of individual contribution.
Thus, as a matter of law, we reject Count II and Count III of Conrail's complaint, deny Conrail's motion for summary judgment, and grant the summary judgment motions of Reading, the United States[78] and Amtrak.

C. Count IV: the post-transfer period
Conrail contends in Count IV of its complaint that it cannot be held liable, given the mandates of the RPSA and NRSA, for acts attributable to the period after Conrail had stopped all operations at both the Paoli and Reading sites.
The provision of NRSA relied on by Conrail provides that "notwithstanding any other provision of law or contract, Conrail shall be relieved of any legal obligation to operate commuter services on January 1, 1983".[79] Conrail also relies on Section 506(h) of the RPSA which "relieve[s] Conrail of liability for any breach which occurs after the date of such conveyance". Again, Conrail takes a general provision of federal railroad legislation aimed at stabilizing rail service and attempts to expand it to include some form of release from CERCLA liability. The purpose of the commuter service provisions of NRSA was the "transfer of Conrail commuter service responsibilities to [SEPTA] ..."[80] and not to apportion CERCLA liability among successive operators. There is no indication that Congress intended these provisions to act as a temporal division of CERCLA liability. Thus, Conrail's reliance on this and similar provisions of NRSA and the RPSA is misplaced.
Conrail also attempts to rely on the general purposes and policies of NRSA. In Section 1132 of NRSA Congress concluded that:
the processes set in motion by the Regional Rail Reorganization Act of 1973 have failed to create a self-sustaining railroad system in the Northeast region of the United States and have cost United States taxpayers many billions of dollars over original estimates....
Because of the perceived failures of the Rail Act, Congress enacted NRSA which, among other things, extricated Conrail from any obligation to provide commuter services and returned local transit authorities, like SEPTA, to the position of operator. Thus, NRSA embodies a policy that is the mirror image of the Rail Act's fresh start policy. Essentially, NRSA sought to free Conrail from its obligation to provide commuter services and give Conrail an opportunity to concentrate on its freight operations. Through NRSA, Congress offered Conrail a "clean break" from these burdensome obligations.
Conrail argues that this general policy shields it from CERCLA liability for any post-conveyance acts; that is, Conrail believes that CERCLA liability is one of the obligations Congress intended to relieve Conrail of by enacting NRSA. Thus, Conrail argues that its "clean break" includes escape from post-conveyance CERCLA liability.
We cannot, based on this assumed policy alone, absolve Conrail from acts of contamination which occurred after December 31, 1982.[81] There is no clear indication that Congress intended to cut off liability in the manner Conrail has suggested. Thus, we cannot grant Conrail the equitable relief it seeks as to Count IV. We, therefore, deny Conrail's motion for summary judgment and *1584 grant the summary judgment motions of Reading and the United States.
A consideration of policy, however, suggests allowing Conrail to avoid liability for acts attributable to the post-transfer period. Conrail, in essence, is asking this Court to declare that it is not liable for the acts of the other operators of the two sites at issue. In Penn Central, this Court relied on the "fresh start" policy as well as specific provisions of the conveyance deeds to hold that operators like Conrail are not liable for pre-conveyance acts of pollution. Underlying that decision, however, was a recognition that Conrail and other railroad operators should be liable only for their own acts of contamination.
That decision, however, is aimed at equitable apportionment of CERCLA liability and, therefore, must be made by the district court as decided earlier in this opinion. There may be technical issues regarding the contaminants' reaction with the environment that affect this decision. Any apportionment of the CERCLA liability owed, however, should also consider the history of operation at each site. Conrail should and will have an opportunity to show that the environmental harm is divisible and that liability should be apportioned after consideration of the acts of contamination committed by the other site operators.

V. Amtrak's counterclaim against Conrail
Amtrak's counterclaim[82] is essentially the same claim as that in Count I of Conrail's complaint: Amtrak contends that it cannot be held liable for CERCLA liability attributable to pre-conveyance acts at the Reading Terminal or the Paoli Yard. As discussed earlier, this issue is controlled by this Court's recent decision in Penn Central. According to that precedent, Amtrak, as a matter of law, should not be held liable for acts of contamination perpetrated by either Penn Central or Reading before the Rail Act mandated the transfer of the properties. Thus, Amtrak is entitled to a declaratory judgment limiting its liability as outlined in its counterclaim.
As also outlined in our discussion of Conrail's Count I, this judgment may be of little consequence if the district court decides to impose joint and several liability under CERCLA. Thus, while we hold in favor of Amtrak, we note that this is but one of many issues to be resolved before final apportionment can be achieved.

VI. SEPTA's cross-claim against the United States
SEPTA's cross-claim alleges that, as regards Counts II and III of Conrail's complaint, any liability to Conrail incurred in this case by SEPTA should be indemnified by the United States. This claim is based on the provisions of the Rail Act which required SEPTA to offer financial support in the same manner as before the creation of Conrail and provided that the United States would subsidize any additional costs.
Since we have rejected both Count II and Count III of Conrail's complaint, we find it unnecessary to decide SEPTA's cross-claim. The cross-claim is based on a contingency which, after today's decision, is very unlikely to occur. Accordingly, it is moot and we cannot address the merits of the claim at this time.
NOTES
[1] The first case in which the Special Court investigated the relationship between CERCLA and the Rail Act is Penn Central Corporation v. United States, 862 F.Supp. 437 (Sp.Ct.R.R.R.A.1994).
[2] 45 U.S.C. § 719 et seq.
[3] 42 U.S.C. § 9601 et seq.
[4] Regional Rail Reorganization Act Cases, 419 U.S. 102, 111, 95 S.Ct. 335, 343, 42 L.Ed.2d 320 (1974).
[5] 45 U.S.C. § 801 et seq.
[6] For a discussion of the ownership and operational history of the Paoli Yard, see In the Matter of Penn Central Transportation Company, 944 F.2d 164, 165-66 (3d Cir.1991), cert. denied, 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992).
[7] Id. at 166.
[8] For a discussion of the ownership and operational history of the Reading Terminal, see Reading Company v. City of Philadelphia, 823 F.Supp. 1218, 1222-25 (E.D.Pa.1993).
[9] Conrail has now dropped its motion for summary judgment on the immunity portion of Count II. Conrail's Memorandum of Law in Further Support of Its Motion for Summary Judgment at 1. The summary judgment motions of the United States, Reading, and Amtrak on this issue are still outstanding.
[10] Conrail has now dropped its motion for summary judgment on the immunity portion of Count III. Conrail's Memorandum of Law in Further Support of Its Motion for Summary Judgment at 1. The summary judgment motions of the United States, Reading, and Amtrak on this issue are still outstanding.
[11] 45 U.S.C. § 562 et seq.
[12] 45 U.S.C. § 1101 et seq.
[13] Consolidated Rail Corporation v. Penn Central Corporation, 533 F.Supp. 1351, 1353 (Sp.Ct. R.R.R.A.1982).
[14] Consolidated Rail Corporation v. Pittsburgh & Lake Erie Railroad Company, 459 F.Supp. 1013, 1016-17 (Sp.Ct.R.R.R.A.1978) (outlining the legislative history of § 209(e)(2)).
[15] Penn Central Corporation v. U.S., 814 F.Supp. 1116, 1119-1121 (Sp.Ct.R.R.R.A.1993) (holding that the court has jurisdiction to decide claims almost identical to those alleged here in Conrail's Count I); Consolidated Rail Corporation v. Dicello, 121 B.R. 406, 409 (Sp.Ct.R.R.R.A.1990) (concluding that an interpretation of language in the FSP is within the Special Court's jurisdiction); Consolidated Rail Corporation v. Penn Central Corporation, 533 F.Supp. 1351, 1353-55 (Sp.Ct. R.R.R.A.1982) (holding that the interpretation of both conveyance orders and documents is within the jurisdictional grant of § 209(e)(2)); Stratford Land and Improvement Company, Inc. v. Blanchette, 448 F.Supp. 279, 282-285 (Sp.Ct.R.R.R.A. 1978) (determining the effect of a conveyance order and documents); Consolidated Rail Corporation v. Pittsburgh & Lake Erie Railroad Company, 459 F.Supp. 1013, 1017 (Sp.Ct.R.R.R.A.1978) (holding that the Court had jurisdiction to decide issues relating to the FSP, conveyance orders, and an agreement entered pursuant to the conveyance orders).
[16] 459 F.Supp. 1013 (Sp.Ct.R.R.R.A.1978).
[17] Id. at 1014-15.
[18] Id. at 1016-17.
[19] Id. at 1017.
[20] Id.
[21] 533 F.Supp. 1351 (Sp.Ct.R.R.R.A.1982).
[22] Id. at 1353-54.
[23] Id. at 1354 n. 4.
[24] 121 B.R. 406, 409 (Sp.Ct.R.R.R.A.1990).
[25] Id. at 409.
[26] 448 F.Supp. 279 (Sp.Ct.R.R.R.A.1978).
[27] Id. at 281-82.
[28] Id. at 285-86.
[29] Id. at 286.
[30] Id.
[31] Id.
[32] Id.
[33] 862 F.Supp. 437, 467 (Sp.Ct.R.R.R.A.1994).
[34] County of Delaware's Motion to Dismiss at 7.
[35] International Brotherhood of Boilermakers v. Kelly, 815 F.2d 912, 915 (3d Cir.1987) (quoting Dow Chemical Co. v. United States Environmental Protection Agency, 605 F.2d 673, 678 (3d Cir. 1979)); County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).
[36] Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643, 647 (3d Cir.1990) (quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)). Jurisdictional requirements under the Declaratory Judgment Act are the same as with all other cases as the act is "not intended to expand jurisdiction." 28 U.S.C. § 2201.
[37] Armstrong World Industries v. Adams, 961 F.2d 405, 412 (3d Cir.1992).
[38] Federal Rule of Civil Procedure 54.
[39] Princeton Community Phone Book, Inc. v. Bate, 582 F.2d 706 (3d Cir.), cert. denied, 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978); see also, County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); United States v. W.T. Grant Co, 345 U.S. 629, 633, 73 S.Ct. 894, 897-98, 97 L.Ed. 1303 (1953); Knuckles v. Weinberger, 511 F.2d 1221, 1222 (9th Cir.1975); Jefferson School of Social Science v. Subversive Activities Control Board, 331 F.2d 76, 78 (D.C.Cir.1963).
[40] Conrail has made a motion for summary judgment on its complaint. In opposition, Reading and the United States have moved for summary judgment in their favor on Conrail's complaint. Amtrak has made a similar motion but only as to Counts II and III of Conrail's complaint.
[41] The United States, in defending against Count I, makes a claim that a portion of Conrail's claim is barred by principles of res judicata. This argument, however, is not fully developed in the briefs and was only briefly referred to at oral argument. We cannot accept this contention and bar Conrail's Count I without a full explanation of the applicable law and facts. The United States has not offered a complete argument and we decline to construct an argument on its behalf.
[42] 862 F.Supp. 437 (Sp.Ct.R.R.R.A.1994).
[43] Id. at 461-62.
[44] Id. at 462-63.
[45] Id. at 463-64.
[46] Id. at 465-69.
[47] Id. at 467-69.
[48] Id. at 467.
[49] In fact, the conveyance deed transferring the Paoli Yard was actually at issue in the Penn Central case. Here, we also consider the conveyance deed for the Reading Terminal which, in all material respects, is identical to the one used to convey the Paoli Yard. Both deeds provide that the grantee, Conrail:

assumes no obligation or liability that arises after the date of delivery of this Deed out of any event, act or failure to act that occurred prior thereto and, where an obligation or liability is related to a period which is both before and after such date, [the Grantee] assumes only that portion of the obligation or liability which is reasonably allocable to the part of the period after such a date.
[50] Penn Central Corporation, 862 F.Supp. at 463. (emphasis added).
[51] In the Matter of Bell Petroleum Services, Inc., 3 F.3d 889, 895 (5th Cir.1993); United States v. Monsanto, 858 F.2d 160, 171 (4th Cir.1988), cert. denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).
[52] In the Matter of Bell, 3 F.3d at 895.
[53] Penn Central, 862 F.Supp. at 467.
[54] The litigants cite Chesapeake and Potomac Telephone Co. v. Peck Iron & Metal, 814 F.Supp. 1269 (E.D.Va.1992). In Peck Iron, the court rejected an argument by the defendants that the plaintiff, as one of the contaminators, could not bring an action for recovery of cleanup costs under § 107 of CERCLA but was limited to a contribution action under § 103. Id. at 1277. The Peck Iron court went on to hold, however, that as an initial division of liability, it would divide the cleanup costs into a "plaintiff's share" and "defendants' share". Id. As a result, the plaintiff/contaminator could obtain only a joint and several judgment against the defendants for the "defendants' share" and it could not obtain a joint and several judgment to recover the total cost of cleanup. Id.
[55] For a discussion of the varied approaches to apportioning liability, see, Patrick S. Martin, Comment, The Legacy of the Chem-Dyne: Searching For Equity in CERCLA Cost Recovery Actions, 25 Tex.Tech.L.Rev. 909 (1994); Suzanne S. Dickey, Note, In Re Bell Petroleum Services, Inc.: The Fifth Circuit Limits the Imposition of Joint and Several Liability on CERCLA Defendants, 68 Tul. L.Rev. 1663 (1994); see also, Daniel D. Barnhizer, Note, Joint and Several Liability and Contribution Under CERCLA Sections 107(a)(4)(b) and 113(f)(1), 18 Harv.Envtl.L.Rev. 563 (1994).
[56] U.S. v. Alcan Aluminum Corp., 964 F.2d 252, 268 (3d Cir.1992) (quoting United States v. Chem-Dyne Corporation, 572 F.Supp. 802, 808 (S.D.Ohio 1983)); see also, U.S. v. Alcan Aluminum Corp., 990 F.2d 711, 723 (2d Cir.1993).
[57] Section 304(e)(2) of the Rail Act provides:

If a State or such an authority was providing financial assistance for the continuation of rail passenger service on rail properties immediately prior to such date of conveyance, it shall provide the same level of financial assistance during such 180-day mandatory operation period.
[58] Section 304(e)(5).
[59] See, Standards for Determining Commuter Rail Service Continuation Subsidies and Emergency Operating Payments, 41 Fed.Reg. 32,546, 32,546-32,547 (August 3, 1976).
[60] 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).
[61] Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 536, 104 S.Ct. 831, 838-39, 78 L.Ed.2d 645 (1984) (citing Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982)).
[62] Cort, 422 U.S. at 78, 95 S.Ct. at 2087-88; Northwest Airlines v. Transport Workers, 451 U.S. 77, 91-94, 101 S.Ct. 1571, 1580-82, 67 L.Ed.2d 750 (1981); Daily Income, 464 U.S. at 536, 541, 104 S.Ct. at 838-39, 841; see also, National RR. Passenger Corp. v. Passenger Association, 414 U.S. 453, 456-64, 94 S.Ct. 690, 692-96, 38 L.Ed.2d 646 (1974); In re Olympia Brewing Co. Securities Litigation, 674 F.Supp. 597, 608-09 (N.D.Ill.1987). The cases list a final factor for consideration: whether the cause of action is traditionally within the province of state law. Olympia Brewing, 674 F.Supp. at 608. However, since issues regarding the Rail Act are exclusively federal, this factor is not relevant to our inquiry.
[63] See, Ex Parte No. 293, Sub-No. 8, Standards for Determining Commuter Rail Service Continuation Subsidies and Emergency Operating Payments, 41 Fed.Reg. 5632 (December 28, 1976).
[64] Standards for Determining Commuter Rail Service Continuation Subsidies, 46 Fed.Reg. 38,392 (July 27, 1981) (denial of SEPTA's petition for rulemaking) (quoting the report of the Secretary of Transportation undertaken pursuant to § 304(e)(8)).
[65] Id. at 38,393. The RSPO, in denying SEPTA's request for a rulemaking on the issue of liability apportionment, stated that it "believes that it is significant that Congress required a liability report to be submitted and, that after receiving the report, has not passed any amendatory legislation." Id.
[66] See discussion of governing Commuter Standards infra at text corresponding to notes 64-71.
[67] Senate Report 93-601, Regional Rail Reorganization Act of 1973, Pub.L. # 93-236, reprinted in 1973 U.S.C.C.A.N. 3242.
[68] Standards for Determining Commuter Rail Service Continuation Subsidies and Emergency Operation Payments, 41 Fed.Reg. 32,546 (August 3, 1976). The regulations state that the subsidizers are responsible for "any costs reasonable and necessarily sustained under Accounts 414, 415-17, 419 and 420 arising out of the operation of commuter services." Id. at 32,553. At the end of the regulations, Accounts 416 and 420 are defined respectively as "damage to property" and "damage to persons." Id at 32,558.
[69] Standards for Determining Commuter Rail Service Continuation Subsidies and Emergency Operation Payments, 46 Fed.Reg. 38,392 (July 27, 1981).
[70] Id. at 38,392.
[71] Cort, 422 U.S. at 78, 95 S.Ct. at 2087-88.
[72] Standards for Determining Commuter Rail Service Continuation Subsidies and Emergency Operation Payments, 41 Fed.Reg. 32,546 (August 3, 1976).
[73] Id. at 32,546-32,547.
[74] Id. (noting that "the Office believes that these flexible (but fail-safe) procedures are more likely to produce reasonable and equitable agreements and practices than would mandatory regulations").
[75] Id.
[76] Id.
[77] 42 U.S.C. § 9607(a).
[78] The United States, in opposition to the indemnity obligation Conrail seeks to impose in Count II and III of its complaint, claims that the doctrine of sovereign immunity bars Conrail from seeking indemnification from the United States. Since we conclude that Conrail has no right of action against the United States under the Rail Act, it is unnecessary to decide whether, if such a claim existed, the United States would enjoy immunity from suit.
[79] NRSA § 1136.
[80] NRSA § 1133(2).
[81] In the Penn Central decision we declined to shield Conrail from CERCLA liability for pre-conveyance acts based on the fresh start policy alone. 862 F.Supp. at 461-62. Similarly, we cannot here declare that Conrail is not liable for post-conveyance contamination without a more specific provision on which to rely.
[82] As pointed out by the United States in its brief in opposition to Amtrak's motion for summary judgment, although Amtrak has labelled this a counterclaim against Conrail, it should actually be a claim by Amtrak against Conrail and the other defendants in this action.