459 F.Supp. 1013 (1978)
CONSOLIDATED RAIL CORPORATION, Plaintiffs,
v.
PITTSBURGH AND LAKE ERIE RAILROAD COMPANY, Defendants.
Civ. A. No. 78-2.
Special Court, Regional Rail Reorganization Act.
October 18, 1978.
Laurence Z. Shiekman, Philadelphia, Pa. (John G. Harkins, Jr., and Teresa R. Novick, Washington, D.C., of counsel), Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiff Consolidated Rail Corp.
*1014 Fritz R. Kahn, Washington, D.C. (Dennis J. Whittlesey and Floyd H. Lewis, Washington, D.C., of counsel), Verner, Lipfert, Bernhard & McPherson, Washington, D.C., for defendant Pittsburgh and Lake Erie R. Co.
Henri F. Rush, Associate Gen. Counsel, Washington, D.C. (Mark L. Evans, Gen. Counsel, Washington, D.C.), for intervenor Interstate Commerce Commission.
Before FRIENDLY, P. J., and WISDOM and THOMSEN, JJ.
FRIENDLY, Presiding Judge:
In this action Consolidated Rail Corporation (ConRail) seeks declaratory and injunctive relief with respect to a controversy which has arisen between it and the Pittsburgh & Lake Erie Railroad Company (P&LE) with respect to a trackage rights agreement relating to the Ashtabula Harbor Branch, formerly owned by the Penn Central Transportation Company (Penn Central), extending northward from Ashtabula, Ohio, to the coal and iron ore docks at the Lake Erie lakefront. All these docks save one, called the Pinney Dock, had been owned by Penn Central and are now owned by ConRail.
The trackage rights agreement was executed pursuant to the Final System Plan (FSP) and designations thereunder. The FSP stated:
P&LE is being offered access to Penn Central's Ashtabula, Ohio coal and iron ore transload facilities via trackage rights between Youngstown and Ashtabula and joint use of PC's Astabula Docks. This would allow it to provide single line service between Lake Erie and the important steel-producing Pittsburgh area. I FSP 26.
The designation section stated this as follows:
P&LE to obtain overhead trackage rights only for the handling of traffic destined to or originated at Ashtabula Harbor, OH over Penn Central line to be transferred to ConRail between Youngstown (Milepost 58.3-Youngstown Branch) and Ashtabula, OH (Milepost 0.0), and between Ashtabula (Milepost 0.0) and Ashtabula Harbor, OH (Milepost 2.3) and obtain joint use of Penn Central Ashtabula Dock facilities to be transferred to ConRail. I FSP 367.
The FSP at I 286 and the December 1, 1976 Official Errata Supplement at 26 made the following statement concerning trackage rights:
In some of the projects, one railroad is offered "overhead rights" over a rail line operated principally by another railroad, and in others a railroad is offered "unrestricted trackage rights." "Overhead trackage rights" permit the railroad to operate trains over a particular line of railroad but not to serve shippers, sidings, or team tracks located along that line of railroad. "Unrestricted trackage rights" include the right to serve shippers, sidings and team tracks located along the line of a railroad as well as the right to operate trains over the line.
P&LE timely accepted the designation. United States Railway Association (USRA) certified to this Court the conveyance by the Penn Central Trustees to ConRail and the grant of trackage rights to P&LE. Pursuant to our conveyance order, the Penn Central Trustees, on March 31, 1976, executed an "operating rights grant" to P&LE giving the latter "overhead trackage rights including the right to use dock facilities presently used by Penn Central and in addition such other facilities as may be determined by mutual agreement of Pittsburgh and Lake Erie Railroad and Consolidated Railroad Corporation" in the Ashtabula Harbor Branch. On the same date ConRail and P&LE executed an implementing agreement, Article VII of which provided:
The trackage rights herein granted are for bridge rights and User shall not perform any local freight service whatever at any intermediate point located on the Joint Trackage except, however, that User shall have rights to (a) connect and interchange with the Norfolk & Western Railway through use of existing and/or future tracks connected with the Joint *1015 Trackage in the vicinity of M.P. 1.1 of the Youngstown Branch at Ashtabula, Ohio, (b) use, in common with Owner, Owner's Carson Yard between M.P. 4.6 and M.P. 5.9 of the Youngstown Branch for the purpose of picking up and setting off cars exclusively in User's service, and (c) leave and enter the Joint Trackage in the vicinity of M.P. 57.6 for the purpose of operating locomotives, cars and trains over Owner's railroad to Sharon and Shenango, Pa., in accordance with the terms of a separate agreement between the parties covering such operation. In the exercise of said rights User shall be subject to such operating conditions as may reasonably be directed by the Owner without prejudice or partiality to either party.
User shall not use any part of the Joint Trackage, except as provided hereinabove, for the purpose of switching or storage of cars, except that nothing contained herein shall, upon approval of Owner, preclude the emergency use by User of such auxiliary tracks as may be designated by Owner for such purpose.
The present controversy arose when P&LE issued a new freight tariff on March 17, 1978, for shipments of ex-lake iron ore in carloads, applicable from "railroad and privately owned docks at Ashtabula Harbor, Ohio" to inland points in Maryland, Ohio and Pennsylvania. A protesting telegram from ConRail elicited a somewhat uninformative answer from P&LE that it believed the tariff to be authorized by the FSP, the trackage rights agreement and the order of conveyance. Some three months later, on July 31, 1978, P&LE filed with the Interstate Commerce Commission a petition, Ex parte No. 293 (Sub-No. 4), now F.D.No. 28825, seeking a declaration that (1) P&LE has the right to serve Pinney Dock, (2) assuming P&LE has such a right to serve Pinney Dock, the intra-terminal switching charge imposed by ConRail does not apply to P&LE traffic between Pinney Dock and the ConRail-owned trackage rights route, and (3) even if the switching charge is applicable, it is unjust and unreasonable. Paragraph 19 of the petition states:
19. P&LE asserts that the designation in the Final System Plan, together with the Special Court's order of conveyance and the Agreement dated March 31, 1976, granted to P&LE the right to handle traffic destined to or originated at all dock facilities, including Pinney Dock, at Ashtabula Harbor.
In this action ConRail seeks a declaratory judgment that the FSP designations, the trackage rights agreement which it executed implementing those designations, and the conveyance order granted P&LE only the right to provide overhead service between the ConRail-owned docks at Ashtabula Harbor, Ohio, and inland points, and that P&LE's attempt to provide service to Pinney Dock, an industry located along the trackage rights route, is inconsistent with the FSP, the certifications by USRA to this Court, and this Court's Order of Conveyance.
ConRail having moved for a stay of the ICC proceedings initiated by P&LE, we set the motion for argument on September 20, 1978. In opposing the stay, P&LE relied principally on the fact that § 209(g) of the Rail Act, quoted in the margin,[1] authorizes us only to enjoin court proceedings; it argued also that a stay would be inappropriate under such familiar decisions as Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 48, 58 S.Ct. 459, 82 L.Ed. 638 (1938), and FPC v. Louisiana Power & Light Co., 406 U.S. 621, 647, 92 S.Ct. 1827, 1841, 32 L.Ed.2d 369 (1972). The ICC sought and was granted leave to intervene for the limited purpose of submitting a memorandum opposing the stay. The Commission also relied on the failure of § 209(g) to empower us to stay or enjoin administrative proceedings and on *1016 the policy against premature interference with administrative action. On the other hand, it agreed with ConRail:
. . . that it is appropriate for this Court to decide the rights of P&LE to serve Pinney Dock under the Final System Plan and under this Court's March 25 order of conveyance, before the Commission rules upon P&LE's petition for declaratory order . . .
and stated that it was prepared to issue a stay of further proceedings in F.D.No.28825 pending a determination of that issue if ConRail would request it to do so. ConRail having so petitioned, the ICC, on September 19, 1978, issued an order staying F.D.No. 28825, "pending a decision of the Special Court on the rights of the Pittsburgh and Lake Erie Railroad Company to serve Pinney Dock."
While we appreciate the cooperative attitude of the Commission, we feel compelled to address a deeper issue raised by the complaint, namely, whether we have jurisdiction of this action at all. If we do not, delay in the ICC proceedings would be unwarranted. As a preliminary to examining that issue, a history of the statutory development will be helpful.
Section 209 of the Rail Act as originally enacted had no counterpart to § 209(e), see 87 Stat. 999-1000 (1974). That subsection was one of the many amendments made by the Railroad Revitalization and Regulatory Reform Act of 1976, 90 Stat. 31. As recounted by Judge Wisdom in Consolidated Rail Corp. v. Illinois, 423 F.Supp. 941, 948-49 (Sp.Ct.1976), cert. denied, 429 U.S. 1095, 97 S.Ct. 1111, 51 L.Ed.2d 542 (1977), § 209(e) as passed by the Senate included as § 209(e)(1) a provision giving this Court original and exclusive jurisdiction
(c) to enforce or declare any rights under this Act;
and the House bill included a similar section (§ 209(e)(3)) giving this Court exclusive jurisdiction of any action "to enforce or declare rights under this Act." In addition, the Senate bill did, but the House bill did not, contain the provision which is now § 209(e)(2).[2] The Senate report noted that:
[a] new subsection (e) would be added to section 209 of the Act to provide that actions brought to challenge or to enforce or declare rights under or pursuant to the Act, the final system plan, and the implementation of the final system plan, are within the original and exclusive jurisdiction of the special court. The jurisdiction of the special court extends to actions by interested parties or by the special court on its own motion, which may be required to give effect to the purposes of the Act and the goals of the final system plan. S.Rep.No. 94-499, 94th Cong., 1st Sess. at 83, U.S.Code Cong. & Admin.News 1976, pp. 14, 98.
In conference the "enforce or declare rights under this Act" clause was removed from subsection (e)(1) but subsection (e)(2) of the Senate bill was left unchanged. The Conference Committee stated:
The conference substitute eliminates the provision giving the special court exclusive jurisdiction over any action to enforce or declare rights under the Rail Act of 1973. Many actions covered by this provision undoubtedly would be within the exclusive jurisdiction of the special *1017 court under other provisions of this bill, but still others may be of no concern to the central functions of the special court under the Rail Act of 1973, as amended. Report of the Committee of Conference, H.R.Rep.No. 94-781, 94th Cong., 2d Sess. (1976) at 188.
Although the instant action would doubtless have been within our original and exclusive jurisdiction if the Conference Committee had not stricken the "enforce or declare rights" subsection of § 209(e)(1), it is not within § 209(e)(1) as enacted. The question is whether the action is nevertheless one under § 209(e)(2) "to interpret . . . or implement any of the orders entered by such court pursuant to § 303(b) of this Act in order to effect the purposes of this Act or the goals of the final system plan."
While our orders of March 25, 1976 directed the Penn Central Trustees to grant P&LE the trackage rights specified in the FSP, no claim is made that this has not been done. The question, rather, is the nature and extent of the privileges conveyed by their grant and the implementation agreement between ConRail and P&LE. Our jurisdiction under § 209(e)(2) has been sustained in a number of cases, e. g., In the Matter of Erie Lackawanna Railway Company, 563 F.2d 784, 790-92 (6 Cir. 1977), where the conveyance order transferring Erie Lackawanna's rolling stock to ConRail incorporated § 303(b)(3)(A) of the Rail Act (Sp.Ct.Rptr.M-000056-58) and the reorganization court had interpreted that provision and thus the conveyance order itself, in Consolidated Rail Corp. v. National Rail Passenger Corp., Sp.Ct.Rptr.D58-0006, where there was a threat that the reorganization court might impose upon ConRail an obligation not included in the conveyance order, and in Stratford Land and Improvement Co., Inc. v. Blanchette, 448 F.Supp. 279, 283-84 (Sp.Ct.1978), where there was a substantial contention that the conveyance order did not conform to the FSP. On the other hand, a reading of § 209(e)(2) that would give us original and exclusive jurisdiction to determine every controversy that may arise over the interpretation of the thousands of instruments executed pursuant to our conveyance orders would seem to run counter to the desire of the Conference Committee to confine us to our "central functions", and to render its paring down of § 209(e)(1) as contained in the Senate and House bills somewhat an exercise in futility. Yet the Conference Committee recognized that many actions covered by the "to enforce or declare rights" provisions excised from § 209(e)(1) of the Senate and House bills would remain within our "original and exclusive jurisdiction"without, unhappily, giving more explicit guidance.
It suffices to sustain our jurisdiction here that ConRail's complaint raises substantial questions with respect to the interpretation of the FSP and our conveyance orders themselves and not merely of the operating rights grant and the implementing agreement. The problem of the Ashtabula docks was discussed not only in the passage, I FSP 26, quoted above but, at greater length, in I FSP 234 which we quote in pertinent part in the margin.[3] Interpreting the instruments here at issue so as to give effect to the intention formulated by USRA and approved by Congress is within "the central functions" of this Courta function which we may not delegate to others, however much we might *1018 prefer to do this. Whatever the correct construction of the "in order" clause of the first sentence of § 209(e)(2) may be, see note 2, supra, this action falls within that subsection. The tribunal deciding the case will have to consider, among other things, what is the effect of the facts that the FSP used the phrase "Penn Central's Ashtabula, Ohio coal and iron ore transload facilities," the designation referred to "Ashtabula Harbor," and the Operating Rights Grant spoke of the "Ashtabula Harbor Branch." Construction of the language must take into account, within the bounds usual in interpretation, what the USRA was endeavoring to accomplish.
Although the helpful action of the Commission has rendered it unnecessary for us to issue a stay in this case, it is appropriate to say, for the guidance of parties in future cases, that we do not believe that § 209(g) precludes us from staying proceedings before administrative agencies, state or federal, when necessary to protect our exclusive jurisdiction. Section 209(g), then labeled § 209(h), appeared for the first time in S. 2718 as reported by the Senate Committee on Commerce, 94th Cong., 1st Sess., Sen.R.No.94-499 at 262, dated November 26, 1975, and as thereafter passed by the Senate. The report stated:
A new subsection (h) is added to make explicit the power of the special court as it relates to the stay of proceedings in other courts that would have an adverse effect on the reorganization process. Sen.R.94-499 at 85, U.S.Code Cong. & Admin.News 1976, p. 99.
The Conference Report of January 23, 1976, 94th Cong., 2d Sess., H.R.Rep.No.94-781 at 187-88, proposed the adoption of a provision almost identical to that in the Senate bill.
As the reports show, the purpose of § 209(g) was simply to make "explicit" a power that would have existed in any event. Even without § 209(g) this Court, being authorized by § 209(b) "to exercise the powers of a district judge in any judicial district" with respect to proceedings over which it has jurisdiction, including "those of a reorganization court", would have had power under the all writs statute, 28 U.S.C. § 1651, to stay or enjoin any proceedings, judicial[4] or administrative, cf. City of Fresno v. Edmonston, 131 F.Supp. 421 (S.D.Cal.1955), that threatened to impair its own jurisdiction, as well as the power conferred by § 2a(15) of the Bankruptcy Act. See Continental Illinois National Bank & Trust Co. v. Chicago, R. I. & P. Ry. Co., 294 U.S. 648, 676, 55 S.Ct. 595, 79 L.Ed. 1110 (1935). Our exclusive jurisdiction could be as much impaired by action of the Interstate Commerce Commission, final save for review by a court of appeals under 28 U.S.C. §§ 2321 and 2342(5) and subsequent grant of certiorari, as by action on the part of another court.[5] No principle of administrative law forbids a court's enjoining proceedings before an administrative agency if the agency lacks jurisdiction of such proceedings because of the exclusive jurisdiction of the issuing court. Compare Public Utilities Comm'n of Ohio v. United Fuel Gas Co., 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1943). No one has urged that the primary jurisdiction doctrine requires us *1019 to obtain the views of the Commission on the issue of P&LE's rights to serve the Pinney Dock, see note 5 supra; indeed the Commission itself wishes us to decide the legal question noted in its stay order before it proceeds with other issues raised by P&LE over which it alone has jurisdiction.
The motion for a stay of F.D.No.28825 is therefore denied solely on the ground that the Commission's order of September 19, 1978 renders this unnecessary. As we indicated at argument, we would welcome the Commission's contributing its expertise to our decision and repeat our invitation to submit suggestions (including the possible use of one of its administrative law judges as a special master) on how this could be done.
NOTES
[1] Section 209(g):

STAY OF COURT PROCEEDINGS.The special court may stay or enjoin any action or proceeding in any State court or in any court of the United States other than the Supreme Court if such action or proceeding is contrary to any provision of this Act, impairs the effective implementation of this Act, or interferes with the execution of any order of the special court pursuant to this Act.
[2] This reads:

(2) The original and exclusive jurisdiction of the special court shall include any action, whether filed by any interested person or initiated by the special court itself, to interpret, alter, amend, modify, or implement any of the orders entered by such court pursuant to section 303(b) of this Act in order to effect the purposes of this Act or the goals of the final system plan. During the pendency of any proceeding described in this paragraph, the special court may enter such orders as it determines to be appropriate, including orders enjoining, restraining, conditioning, or limiting any conveyance, transfer, or use of any asset or right which is subject to such an order or which is at issue in such a proceeding, or which involves the enforcement of any liens or encumbrances upon such assets or rights. Any orders pursuant to this paragraph which interpret, alter, amend, modify, or implement orders entered by the special court shall be final and shall not be restrained or enjoined by any court.
It is not clear whether the "in order" clause of the first sentence applies to "any action" or to "the orders entered by such court".
[3] Involving Smaller Railroads Designed to Preserve Existing Patterns of Rail Service.Four projects included in the Final System Plan involve extensions of lines of smaller railroads to preserve existing service patterns and to improve those railroads' prospects for continued solvency. Project P&LE-4 involves the extension of the Pittsburgh & Lake Erie to Ashtabula, Ohio, through the designation of trackage rights over Penn Central from Youngstown to Ashtabula via Mann, Ohio, a line which is transferred to ConRail. P&LE would also acquire a joint interest with ConRail in the facilities at Ashtabula. Implementation of Project P&LE-4 would improve P&LE's competitive posture and result in an equitable apportionment of rehabilitation costs of the Ashtabula Docks among the major railroads serving the Ashtabula-Youngstown-Pittsburgh market.
The Ashtabula Harbor problem was also discussed by the ICC in its report under § 206(d)(3), Ex parte 293(4), p. 507-08.
[4] This would include state court actions. The anti-injunction statute, 28 U.S.C. § 2283, expressly excepts injunctions "necessary in aid of [the court's] jurisdiction."
[5] Our attention has been called to 28 U.S.C. § 1336(b), which provides that "when a district court or the Court of Claims refers a question or issue to the Interstate Commerce Commission for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Interstate Commerce Commission arising out of such referral." This section and a corresponding amendment of 28 U.S.C. § 1398(b) were enacted to meet the problem arising where the primary jurisdiction doctrine required a court to refer an issue to the ICC but an action to review the Commission's decision lay elsewhere. See United States v. Western Pacific Railroad Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); Pennsylvania Railroad Co. v. United States, 363 U.S. 202, 80 S.Ct. 1131, 4 L.Ed.2d 1165 (1960); [1964] U.S.Code Cong. & Admin.News, pp. 3235-39 (88th Cong., 2d Sess.). The section would not be applicable here since the ICC proceeding was initiated by P&LE and not by a reference from this Court.