# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 20, 2009         Decided June 26, 2009

No. 07-1401

CONSOLIDATED RAIL CORPORATION,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND UNITED STATES OF
AMERICA,
RESPONDENTS

CITY OF JERSEY CITY ET AL.,
INTERVENORS

Consolidated with 07-1529, 08-1019, 08-1052

On Petitions for Review of Orders
of the Surface Transportation Board

*Robert M. Jenkins III* argued the cause for petitioner Consolidated Rail Corporation. *Jonathan M. Broder* was on brief.

*Fritz R. Kahn* argued the cause for petitioners 212 Marin Boulevard, L.L.C. et al.

*Ronald Molteni*, Attorney, Surface Transportation Board,

argued the cause for the respondents. *Deborah A. Garza*, Acting Assistant Attorney General, United States Department of Justice, at the time the brief was filed, *Robert B. Nicholson* and *John P. Fonte*, Attorneys, *Ellen D. Hanson*, General Counsel, Surface Transportation Board, and *Evelyn G. Kitay*, Associate General Counsel, were on brief. *Craig M. Keats*, Associate General Counsel, entered an appearance.

*Andrea Ferster* and *Charles H. Montange* were on brief for the intervenors.

Before: HENDERSON, TATEL and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

"[R]ailway termini . . . are our gates to the glorious and the unknown. Through them we pass out into adventure and sunshine, to them, alas! we return."

—E.M. Forster, *Howards End* 16 (1921)

KAREN LECRAFT HENDERSON, *Circuit Judge*: Consolidated Rail Corporation (Conrail) and 212 Marin, *infra* note 7, petition for review of an order of the Surface Transportation Board (STB or Board) concluding that Conrail must obtain authorization from the Board to abandon certain railroad trackage located in Jersey City, New Jersey. *City of Jersey City—Petition for Declaratory Order*, STB Fin. Docket No. 34818, 2007 WL 2270850 (Aug. 9, 2007) (STB Order), *recons. denied*, Docket No. 34818, 2007 WL 4429517 (Dec. 19, 2007) (STB Recons. Order). For the reasons set out below, we vacate the Board's order.

## I.

In the 1960s and early 1970s, "[a] rail transportation crisis seriously threatening the national welfare was precipitated when eight major railroads in the northeast and midwest region of the country entered reorganization proceedings under . . . the

Bankruptcy Act." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 108 (1974). To resolve the crisis, the Congress enacted the Regional Rail Reorganization Act of 1973, Pub. L. No. 93-236, 87 Stat. 985 (1974) (codified as amended at 45 U.S.C. §§ 701 *et seq.*) (Rail Act), which provided for the "reorganization of the railroads, stripped of excess facilities, into a single, viable system operated by a private, for-profit corporation." *Blanchette*, 419 U.S. at 109; *see also* Rail Act § 101(b), 87 Stat. at 986 (setting forth purposes of Rail Act). The Rail Act established the United States Railway Association (USRA), an incorporated nonprofit association, to carry out the reorganization and Conrail, a railroad headquartered in Philadelphia, to own and operate the reorganized railroad system. Rail Act §§ 201, 202, 301, 302, 87 Stat. at 988-92, 1004-05. In July 1975, the USRA published the Final System Plan (FSP) designating which "rail properties" of railroads in reorganization were to be transferred to Conrail.[1] *See* Rail Act §§ 202(a)(1), 206(c)(1)(A), 87 Stat. at 990, 995. The FSP designated for transfer to Conrail certain "rail lines," FSP at 261 (JA 842), which, "[u]nless otherwise specified, . . . include[] all rail properties . . . connected with, controlling or in any way pertaining to or used or usable by the designee in connection with the rail line designated including . . . connecting spur and storage tracks," *id.* at 241 (JA 965); *see also id.* at 261 (JA 842) (designating for transfer "[t]ransferors' interest in all freight yards associated with rail lines designated to Con[r]ail"). Among the "rail lines" designated for transfer was "Line Code 1420," described as running from the "Jersey City" station at milepost "1.0" to the "Harrison" station at milepost "7.0." *Id.* at

---

[1]"Rail properties" was defined as "assets or rights owned, leased, or otherwise controlled by a railroad which are used or useful in rail transportation service." Rail Act § 102(10), 87 Stat. at 987.

272 (JA 846).[2] The FSP listed "Harsimus Branch" as the "branch name" for "Line Code 1420." *Id.*

In March 1976, the Special Court, a United States district court composed of three federal judges selected by the Judicial Panel on Multi-District Litigation, ordered the trustee or trustees of each railroad in reorganization to convey to Conrail the rail properties designated for transfer in the FSP. Order of Conveyance to Trustees of Railroads in Reorganization in the Region, Misc. No. 75-3(A), at 8-9 (Reg'l Rail Reorg. Ct. Mar. 25, 1976) (Conveyance Order) (JA 648-49); *see* Rail Act §§ 209(b), (c), 303(b)(1), 87 Stat. at 999-1000, 1006; 28 U.S.C. § 1407(d).[3] Pursuant to the Conveyance Order, the trustee of the

---

[2]The United New Jersey Railroad and Canal Company (UNJRCC) owned the rail property designated as "Line Code 1420." In 1871, the Pennsylvania Railroad leased "Line Code 1420" from UNJRCC. In 1968, the Pennsylvania Railroad Company merged into the Penn Central Transportation Company (Penn Central). In performing an inventory of rail lines and related facilities, the USRA referred in part to the Penn Central Engineering Department's records, "which assign[ed] a unique four-digit code, called a line code, to each individual railroad line." FSP at 241 (JA 965). The USRA created a file "listing each individual line of railroad . . . and showing line-code designations as contained in the Penn Central's Engineering Department records . . . , including origin and destination (by milepost, geographic reference and branch name)." *Id.*

[3]Specifically, the Conveyance Order states in pertinent part: "The trustee or trustees of each Transferor identified in each Conveyance Document shall execute . . . and on or before the Conveyance Date shall deliver such Conveyance Document to the Transferee identified therein . . . ." Conveyance Order at 8 (JA 648). The USRA prepared and submitted the conveyance documents referred to in the order to the Special Court along with the FSP. *See id.* at 4-5 (JA 644-45); Deed Between Fairfax Leary, as Trustee of the United New Jersey Railroad and Canal Company, Debtor and Consolidated Rail

UNJRCC conveyed "Line Code 1420" to Conrail. Deed at 1-4 (JA 909-12). The Deed described the property as follows:

> Situate in the County of Hudson, State of New Jersey, and being the United New Jersey Railroad and Canal Company's line of railroad known as the Penn Central Harsimus Branch and being all the real property in the County lying in, under, above, along, contiguous to, adjacent to or connecting to such line.

> Such line originates in the County at Harsimus Cove, passes through Journal Square, and terminates in the County near the junction with the Penn Central New York-Philadelphia Main Line, west of the New Jersey Turnpike Overhead Bridge.

> The line of railroad described herein is identified as Line Code 1420 in the records of the United States Railway Association.

*Id.* at A-2 (JA 914). Attached to the Deed were six valuation maps numbered V-2.1/S.T.-1 through S.T.-6 and a seventh numbered V-1.01/S.T.-2. (JA 926-33).[4] The six maps

_____

Corporation at 4 (executed Mar. 31, 1976) (Deed) (JA 912).

[4]According to the verified statement of Victor Hand, the USRA director of facilities planning, "USRA chose to use as the basis of the conveyance of real property the railroad 'valuation maps' that had been prepared [following surveys conducted during 1915-1920] by all steam railroads pursuant to an order of the Interstate Commerce Commission." Verified S[t]atement of Victor Hand at 2 (Mar. 10, 2006) (Hand Statement) (JA 796). In many instances, the valuation maps were attached to the deeds conveying rail property to Conrail. *Id.* at 3 (JA 797). Hand described the deeds as "negative conveyances" because the deeds conveyed all of the transferor's rail property "except certain parcels of property . . . , which were marked

numbered V-2.1/S.T.-1 through S.T.-6 showed trackage running from Exchange Place, located on the west bank of the Hudson River in Jersey City, west to Harrison, New Jersey. (JA 926-931).[5] The seventh map numbered V-1.01/S.T.-2 showed part of the Harsimus Cove Yard, located on the west bank of the Hudson River immediately to the north of Exchange Place, with portions of the yard marked as "sold." (JA 933). Another valuation map, numbered V-1.01/S.T.-1 and not attached to the Deed, showed trackage branching off the Main Line at Waldo Avenue and running east along 6th Street on a series of embankments and bridges to the Harsimus Cove Yard. (JA 932).[6] The Harsimus Cove Yard "contained coal piers,

---

on specifically prepared valuation maps that were made part of the deed." *Id.*

[5]We refer to the trackage running from Exchange Place to Harrison as the Main Line.

[6]Hand explained that the valuation map numbered V-1.01/S.T.-1 was not included in the Deed because "no excepted property was on this map." Hand Statement at 5 (JA 799). Nevertheless, the UNJRCC trustee conveyed the trackage shown on the map. *Id.* According to Richard James, a member of the board of trustees of the Pennsylvania Railroad Harsimus Stem Embankment Coalition and a respondent herein, the series of embankments and bridges over which the trackage ran was built from 1901 to 1905. The Pennsylvania Railroad Harsimus Branch Embankment, Jersey City, New Jersey, State & National Registers of Historic Places Nomination at 1 (1999) (JA 157). The embankments were made of stone retaining walls filled with earth built between roads running north-south. *Id.* The bridges connecting the embankments ran east-west and spanned the north-south roads. *Id.* The Harsimus Cove Yard was at the eastern end of the trackage running over the embankments and bridges. The western end of the trackage on the embankments was connected to the Main Line at Waldo Avenue by an elevated, two-track line. *Id.* The two-track connecting line converted to seven tracks running over the

warehouses, grain elevators and stockyards, and were the major facilities handling rail-marine traffic to piers and yards in New York City." Hand Statement at 4 (JA 798). By the 1970s, however, rail traffic in the Harsimus Cove Yard had decreased significantly and parts of the yard were no longer used. *Id.*

According to Conrail's real estate director, Conrail began operating the Main Line, Embankment and Harsimus Cove Yard in April 1976. Verified Statement of Robert W. Ryan at 2 (Apr. 17, 2006) (JA 816). He stated that "by the mid-1980s Conrail had sold off most of the Harsimus Cove Yard track to several developers, as well as [to] the [Jersey City] Redevelopment Agency." *Id.* at 11 (JA 824). In the late 1980s, the last shipper left Harsimus Cove Yard. *Id.* Conrail continued to use part of the Embankment as turnaround space for trains until 1994. *Id.* at 12 (JA 825). By 1997, all of the trackage and bridges on the Embankment had been removed. *Id.* at 14 (JA 827). The Jersey City Redevelopment Agency negotiated with Conrail to purchase the Embankment properties—consisting of eight parcels of land on which the individual embankments are located—but negotiations ended without agreement. *Id.* at 14-15 (JA 827-28). In July 2005, Conrail sold the Embankment properties to a private real estate developer.[7]

---

embankments and bridges into the Harsimus Cove Yard. *Id.* The trackage served freight traffic going to the Harsimus Cove Yard from the Main Line and vice versa. *Id.*; *see also* Hand Statement at 3-4 (JA 797-98). We refer to the embankments, bridges and trackage running over them as the Embankment. As noted later, all that remains of the Embankment are the individual embankments.

[7]Conrail sold the Embankment properties to 212 Marin Boulevard, L.L.C., 247 Manila Avenue, L.L.C., 280 Erie Street, L.L.C., 317 Jersey Avenue, L.L.C., 354 Coles Street, L.L.C., 389 Monmouth Street, L.L.C., 415 Brunswick Street, L.L.C. and 446 Neward Avenue, L.L.C., (collectively 212 Marin) which are New

In January 2006, Jersey City, the Rails to Trails Conservancy, the Pennsylvania Railroad Harsimus Stem Embankment Coalition and State Assemblyman Louis M. Manzo (collectively respondents) petitioned the STB for an order under 5 U.S.C. § 554(e)[8] declaring that Conrail was required to obtain authorization from the Board in order to abandon the Embankment. STB Order at 1. A rail carrier must obtain prior authorization from the Board to "abandon any part of its railroad lines" or "discontinue the operation of all rail transportation over any part of its railroad lines." 49 U.S.C. § 10903(a)(1). Abandonment is appropriate "only if the Board finds that the present or future public convenience and necessity require or permit the abandonment." *Id.* § 10903(d). If the Board finds such public convenience and necessity, "it shall . . . approve the application." *Id.* § 10903(e). No authorization is required, however, for the "abandonment[] or discontinuance of spur, industrial, team, switching, or side tracks." *Id.* § 10906. Conrail had not obtained abandonment authorization from the Board before selling the Embankment properties to 212 Marin. In August 2007, the Board declared that "the Embankment property sold to [212 Marin] remains part of the national rail system subject to the Board's exclusive jurisdiction until appropriate abandonment authority is obtained." STB Order at 11. In December 2007, the Board denied 212 Marin's petition for reconsideration. STB Recons. Order at 8. Conrail and 212 Marin separately petitioned for review of the Board's decisions and we consolidated the petitions. Order, *Cons. Rail. Corp. v.*

Jersey limited liability real estate developers. 212 Marin was a party in the Board proceedings and, as noted earlier, is a petitioner here.

[8]"The [STB], with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty." 5 U.S.C. § 554(e).

*STB*, No. 07-1401 (Feb. 5, 2008); Order, *Cons. Rail. Corp. v. STB*, No. 07-1401 (Mar. 18, 2008); *see* 28 U.S.C. § 2321(a) ("[A] proceeding to enjoin or suspend, in whole or in part, . . . [an] order of the Surface Transportation Board shall be brought in the court of appeals . . . ."); 28 U.S.C. § 2342(5) ("The court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . final orders of the Surface Transportation Board made reviewable by section 2321 . . . .").

## II.

We begin—and end—by examining the Board's jurisdiction to consider the respondents' petition for a declaratory order.[9] The Rail Act, as amended, provides:

> The original and exclusive jurisdiction of the special court shall include any action, whether filed by any interested person or initiated by the special court itself, to interpret, alter, amend, modify, or implement any of the orders entered by such court pursuant to section 743(b) of this title in order to effect the purposes of this chapter or the goals of the final system plan.

45 U.S.C. § 719(e)(2).[10] The Special Court was "abolished effective 90 days after October 19, 1996," on which date "all jurisdiction and other functions of the special court [were]

---

[9] 212 Marin first challenged the Board's jurisdiction in its petition for reconsideration in the Board proceedings and renews its challenge here. Although 212 Marin's jurisdictional challenge is apparently untimely (having not been pressed until the reconsideration stage), *see BNSF Ry. Co. v. STB*, 453 F.3d 473, 478-79 (D.C. Cir. 2006), the Board does not raise a timeliness objection.

[10] Section 743(b) authorized the Special Court to order the conveyance of properties designated for transfer in the FSP. 45 U.S.C. § 743(b)(1).

assumed by the United States District Court for the District of Columbia." *Id.* § 719(b)(2). In *Consolidated Rail Corp. v. Pittsburgh and Lake Erie Railroad Co.*, 459 F. Supp. 1013 (Reg'l Rail Reorg. Ct. 1978), the Special Court concluded that it had exclusive jurisdiction of an action seeking a declaratory judgment regarding the trackage rights of the Pittsburgh and Lake Erie Railroad Co. (P&LE). 459 F. Supp. at 1017-18. Pursuant to the Special Court's conveyance order and the FSP, P&LE and Conrail executed an "operating rights grant" and an implementing agreement giving P&LE certain trackage rights. *Id.* at 1014. The Special Court noted that it was undisputed that trackage rights had been granted. *Id.* at 1017. "The question, rather, is the nature and extent of the privileges conveyed," which the Special Court determined "raises substantial questions with respect to the interpretation of the FSP and [the] conveyance orders themselves." *Id.* In *Consolidated Rail Corp. v. Penn Central Corp.*, 533 F. Supp. 1351 (Reg'l Rail Reorg. Ct. 1982), the Special Court concluded that it had exclusive jurisdiction of an action seeking a declaratory judgment that its conveyance order "conveyed to Conrail all of Penn Central's right, title and interest in a lease of certain railroad equipment." 533 F. Supp. at 1352. The Special Court concluded that "interpretation of a conveyance order is clearly within [its] exclusive original jurisdiction." *Id.* at 1353. It also concluded that it had "jurisdiction to consider at least some aspects of [the conveyance document]" because "it involves the implementation of [the] conveyance order." *Id.* at 1353-54.[11]

---

[11]The Special Court observed that "not every challenge 'relating to the [Rail] Act' is within its exclusive jurisdiction," *Penn Central Corp.*, 533 F. Supp. at 1353 (quoting *Consol. Rail Corp. v. Illinois*, 423 F. Supp. 941, 948 (Reg'l Rail Reorg. Ct. 1976), but that it had "exclusive jurisdiction where resolution of the dispute involves the court's 'central functions,'" *id.* (quoting *P&LE*, 459 F. Supp. at 1017). The term "central functions" appears in the legislative history of the

It is undisputed that the FSP designated the Embankment for transfer and that the UNJRCC in fact conveyed the Embankment to Conrail pursuant to the Conveyance Order. The issue, rather, is the "nature" of the conveyance, *P&LE*, 459 F. Supp. at 1017, that is, as a line of railroad or as spur and yard track. *See* STB Order at 8 ("The issue before us here is whether the Embankment was transferred to Conrail as a line of railroad included under Line Code 1420, in which case Board abandonment authority would be required, or whether the Embankment was only ancillary spur and yard track that can be abandoned under 49 U.S.C. 10906 without regulatory approval."). As noted, the FSP designated for transfer certain "rail lines," freight yards associated with those rail lines and "connecting spur and storage tracks." FSP at 241, 261 (JA 842, 965). The Board interpreted "Line Code 1420" in the FSP to include the Embankment as a "rail line." STB Order at 8-10 ("[W]e conclude that Conrail acquired the Embankment as a line of railroad under Line Code 1420 of the FSP."). Conrail and 212 Marin argued that the Embankment was spur and yard track

---

Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94-210, 90 Stat. 31, which amended the Rail Act to add, *inter alia*, section 209(e)(2). *Id.* § 602, 90 Stat. at 86. As explained in *P&LE*, the original bill to amend section 209 would have given the Special Court original and exclusive jurisdiction "to enforce or declare any rights under this Act." *P&LE*, 459 F. Supp. at 1016 (internal quotations omitted). The conference committee removed the clause, explaining that "[m]any actions covered by this provision undoubtedly would be within the exclusive jurisdiction of the special court under other provisions of this bill, but still others may be of no concern to the *central functions* of the special court under the Rail Act of 1973." *Id.* at 1016-17 (internal quotations omitted and emphasis added). The Special Court itself has held that interpreting conveyance documents "so as to give effect to the intention formulated by USRA and approved by Congress is within 'the central functions' of [the Special] Court." *Id.* at 1017-18.

ancillary to "Line Code 1420" under the FSP and Conveyance Order. All parties before us appear to agree that the FSP used the phrase "rail line" in the sense relevant to the Board's abandonment authority (i.e., as distinguished from "spur") and consequently that the FSP resolves the Embankment's status for this purpose. The petition for a declaratory order in this case, therefore, "raises substantial questions with respect to the interpretation of the FSP and [the Special Court's] conveyance orders themselves," *P&LE*, 459 F. Supp. at 1017, and, accordingly, the petition falls within the "original and exclusive jurisdiction" of the United States District Court for the District of Columbia as successor to the Special Court "to interpret . . . [an] order[] entered by [the Special Court]." 45 U.S.C. § 719(e)(2). We conclude that the Board was without jurisdiction to consider the respondents' petition for a declaratory order pursuant to 5 U.S.C. § 554(e).

Nevertheless, the Board asserts that "[a]scertaining the status of track and rail property is an implicit part of every abandonment proceeding" and that requiring the district court *qua* the Special Court to ascertain the status of rail property "would make it very difficult for the [Board] to exercise its responsibilities." Resp.'s Br. at 31-32. In its decision denying reconsideration, the Board concluded it had jurisdiction under its statutory authority to approve or deny applications for abandonment pursuant to 49 U.S.C. § 10903. STB Recons. Order at 8; *see also* Rail Act § 304(e) (codified as amended at 45 U.S.C. § 744(g)) ("After the rail system to be operated by [Conrail] . . . under the [FSP] has been in operation for 2 years, the Commission may authorize . . . abandon[ment of] any rail properties as to which it determines that rail service over such properties is not required by the public convenience and necessity . . . ."). Because the Board "does not have authority . . . over . . . abandonment . . . of spur, industrial, team, switching, or side tracks," 49 U.S.C. § 10906, the Board's approval or denial of an abandonment application presupposes

that the trackage for which abandonment is sought is "part of [the rail carrier's] railroad lines" subject to the Board's abandonment authority under section 10903. In abandonment proceedings in which the Board's authority is not disputed based on the nature of the trackage, however, the issue of the track's nature would presumably not arise. *See, e.g., Consol. Rail Corp.*, STB Docket No. AB-167 (Sub-No. 1178X), 1997 WL 453441 (Aug. 12, 1997) (exempting abandonment of rail line from prior approval requirement). In other proceedings, the nature of the trackage may be contested but resolution of the issue would not require interpretation of the FSP or the Special Court's conveyance orders and thus would not implicate the Special Court's (now district court's) exclusive jurisdiction. *See, e.g., Chelsea Prop. Owners*, 8 I.C.C. 2d 773, 789-91 (1992) (concluding trackage was "rail line" subject to abandonment authorization and not "spur" without reference to FSP or conveyance orders). Only in proceedings in which the Board's authority is challenged and an interpretation of the FSP or the Special Court's conveyance order under 45 U.S.C. § 719(e)(2) is required does the Board lack jurisdiction to resolve the question of the nature of the trackage sought to be abandoned. In such a case, as here, we see no conflict between 45 U.S.C. § 719(e)(2) and 49 U.S.C. §§ 10903 and 10906. The Board retains its authority under sections 10903 and 10906 to approve or deny an abandonment application. Under 45 U.S.C. § 719(e)(2), however, the district court *qua* the Special Court retains its exclusive jurisdiction to decide the antecedent question if it arises, namely, whether the trackage was conveyed by the FSP as "part of [the rail carrier's] railroad lines." 49 U.S.C. § 10903(a)(1)(A).

For the foregoing reasons, we conclude that the Surface Transportation Board's orders in *City of Jersey City—Petition*

*for Declaratory Order* issued outside its jurisdiction and we therefore vacate the same.

*So ordered.*