# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 18, 2011        Decided February 3, 2012

No. 10-7135

CITY OF JERSEY CITY, ET AL.,
APPELLANTS

v.

CONSOLIDATED RAIL CORPORATION, ET AL.,
APPELLEES

PAULA T. DOW, ATTORNEY GENERAL OF THE STATE OF
NEW JERSEY,
INTERVENOR

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01900)

*Charles H. Montange* argued the cause for appellants. With him on the briefs was *Andrea C. Ferster*.

*Elizabeth S. Merritt* was on the brief of *amici curiae* National Trust for Historic Preservation, et al. in support of appellants.

*Robert M. Jenkins*, *III*, argued the cause for appellees. With him on the briefs were *Adam C. Sloane* and *Fritz R. Kahn*.

*Paula T. Dow*, Attorney General, Office of the Attorney General for the State of New Jersey, and *Kenneth M. Worton*, Deputy Attorney General, were on the briefs for intervenor Paula T. Dow, Attorney General of New Jersey.

Before: TATEL and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Consolidated Rail Corporation (Conrail) sold its Harsimus Embankment in Jersey City to developers. The City, together with others interested in the historic and environmental value of the Embankment, sued Conrail, alleging that the sale was unlawful because Conrail failed to obtain authority from the Surface Transportation Board to abandon the property. The district court, which has jurisdiction over this case because of the unique nature of the Harsimus Branch—it was transferred to Conrail as part of the Penn Central bankruptcy—dismissed the case for lack of standing. For the reasons set forth in this opinion, we reverse.

## I.

The Harsimus Embankment is a six-block, half-mile long stone structure in the heart of Jersey City's historic downtown. Made of maroonish-brown ashlar, the edifice carries seven rail lines as high as twenty-seven feet above street level. Constructed from 1901 to 1905, these lines served the Pennsylvania Railroad for decades, but as the twentieth century wore on, traffic dwindled, and dwindled, and perhaps inevitably, on a probably-unremarkable day in the early 1990s, the last train ever to use the line came and went. Built to be an artery in shipping and commerce, the Embankment— once a symbol of modernity—is now covered in foliage and

stands, somewhat ironically, as a quaint memorial to a bygone era, a verdant holdout against modern urban sprawl.

A place like that is bound to draw attention. The Embankment presents an opportunity for developers who see new and more profitable uses for the land—in this case, the developers (LLCs) to whom Conrail sold the property. At the same time, the Embankment attracts those who see its rustic qualities and historic value as irreplaceable—here the City of Jersey City, the Rails to Trails Conservancy, and the Pennsylvania Railroad Harsimus Stem Embankment Preservation Coalition.

To explain why a dispute over six blocks of property in New Jersey has ended up in the United States Court of Appeals for the District of Columbia Circuit—indeed, for the second time—we begin with some regulatory background. The Interstate Commerce Commission Termination Act requires that rail carriers obtain Surface Transportation Board (STB) approval before "abandon[ing] any part of its railroad lines." 49 U.S.C. § 10903(a). By contrast, carriers need no such approval for "spur, industrial, team, switching, or side tracks." 49 U.SC. § 10906; s*ee also* 49 U.S.C. § 11323(a)(2) (listing transactions which "may be carried out only with the approval and authorization of the Board"). Ordinarily, STB decides whether tracks qualify as "railroad line" and thus require abandonment authorization. *See* 49 U.S.C. § 10903(a).

This, however, is not an ordinary case. In 1968, the Pennsylvania Railroad, of which the Harsimus Branch was a small part, merged with a rival to form the Penn Central Transportation Company. By the early 1970s, the Penn Central, along with eight other major railroads, filed for bankruptcy, precipitating a "rail transportation crisis." *See Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 108

(1974). In response, Congress enacted the Regional Rail Reorganization Act of 1973, which established two new entities: one to reorganize the railroad system, the United States Railway Association (USRA); and the other to own and operate the reorganized system, Conrail, a railroad headquartered in Philadelphia. *See Consol. Rail Corp. v. Surface Transp. Bd.*, 571 F.3d 13, 14–15 (D.C. Cir. 2009) ("*Conrail I*"). In 1975, USRA published a Final System Plan that, among other things, formally transferred the bankrupt carriers' rail properties to Conrail. The Harsimus Branch was one such property. The Rail Act also created a "special court" with exclusive jurisdiction over disputes relating to the Final System Plan, 45 U.S.C. § 719, including responsibility for determining whether tracks conveyed to Conrail by the Plan qualify as "railroad line," which Conrail could not abandon without STB authorization. *See generally id.* Congress later abolished that court and transferred its "jurisdiction and other functions" to the United States District Court for the District of Columbia. *Id.* § 719(b)(2).

With this background in mind, we return to the facts of the case. In the late 1990s, Conrail began discussions with the Jersey City Redevelopment Authority about redeveloping the Harsimus Embankment for residential housing. These redevelopment plans were blocked, however, when a group of citizens successfully petitioned the State of New Jersey to have most of the Embankment designated as a "historic place" in the New Jersey State Register of Historic Places. In early 2003, after Conrail formally put the property out for bid, the City passed an ordinance designating the Embankment as a "historic landmark," meaning that the property could be developed only with the consent of the Jersey City Historic Preservation Commission.

Conrail began negotiating with SLH Holdings Company to sell the Embankment to the LLCs, which SLH had formed for that purpose. Soon thereafter, the City sent Conrail a letter proposing to "open up a dialogue" to have a public entity acquire the property. *City of Jersey City v. Consol. Rail Corp.*, 741 F. Supp. 2d 131, 135 (D.D.C. 2010). In 2004, Jersey City passed an ordinance authorizing the City to purchase or condemn the Embankment. Subsequently, however, the City's lawyers advised it that it could neither purchase nor condemn the Harsimus Embankment because it was "railroad line" that Conrail could lawfully abandon only with STB authorization. Having received no offer from the City, Conrail, believing that the Harsimus Branch qualified as "spur, industrial, team, switching, or side tracks" that it could abandon without STB approval, sold the Harsimus Embankment to the LLCs.

When the LLCs began dismantling the tracks and other rail structures, the City petitioned STB for a declaratory order that Conrail's sale was void because the Embankment was "railroad line" requiring STB abandonment authorization. Although STB agreed with the City, we vacated that decision in *Conrail I*, holding that because the dispute related to property transferred pursuant to the Final System Plan, it fell within the "original and exclusive jurisdiction" of the special court, now the U.S. District Court for the District of Columbia. *Conrail I*, 571 F.3d at 19–20.

Accordingly, the City, joined by Rails to Trails Conservancy and the Pennsylvania Railroad Harsimus Stem Embankment Preservation Coalition, filed a complaint in the district court, arguing again that Conrail's sale of the Harsimus Embankment was void because it had failed to obtain STB abandonment authority. The LLCs intervened as defendants. The district court dismissed the complaint for lack of standing because, among other things, "plaintiffs have not

established that judicial intervention here would tangibly benefit Jersey City in its efforts to acquire the property through condemnation." *City of Jersey City*, 741 F. Supp. 2d at 141.

The City and environmental plaintiffs now appeal. Our review is de novo. *See, e.g.*, *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).

## II.

For plaintiffs to establish Article III standing, at least one must demonstrate that it has suffered an injury that is "concrete and particularized" as well as "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) ("[I]f constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim."). That "injury must be fairly traceable to the challenged action of the defendant, and likely to be redressed by a favorable decision." *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (internal quotation marks omitted). At this stage of the litigation, we "must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in plaintiffs' favor." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (internal quotation marks omitted). And critical to the issue before us, we must assume that plaintiffs will prevail on the merits of their claims—here that the Harsimus Embankment is "railroad line" requiring STB abandonment authorization. *See Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008).

In support of its claim for standing, the City argues that because of its interest in the historic and environmental value

of the property, it wishes to acquire the Harsimus Embankment, or at least to minimize any harm to the property. According to the City, STB proceedings offer an array of benefits that protect these interests—i.e., redress its injury. First, STB can place conditions on its abandonment authorization. For example, STB administers a statute under which parties can seek "public use conditions," which afford local governments an opportunity to acquire railroad lines before they are sold to developers. *See* 49 U.S.C. § 10905. In addition, the National Environmental Policy Act and National Historic Preservation Act reviews that are part of STB's process are designed to preserve and protect historic properties like the Embankment. These reviews can inform the conditions that STB imposes, which can in turn protect the City's interests in the historic and environmental value of the property. *See* 16 U.S.C. § 470f (requiring agency to "take into account" adverse impacts on properties listed or eligible for listing on the National Register of Historic Places prior to the issuance of an abandonment license); *Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1259 (D.C. Cir. 1988) (the National Environmental Protection Act, 42 U.S.C. § 4321, et seq., requires the STB to take a "hard look" at environmental consequences of its action); *see also Consol. Rail Corp. v. ICC*, 29 F.3d 706, 713 (D.C. Cir. 1994) ("There is no restriction placed on the conditions the [agency] can impose other than that they must be required by the public convenience and necessity."). Second, New Jersey has a "right of first refusal statute," which, once STB authorizes abandonment, would give the City an exclusive ninety-day window to decide whether it wants to acquire the abandoned property. *See* N.J. Stat. Ann. § 48:12-125.1(b). Finally, STB abandonment authority would permit Jersey City to use its general condemnation power to acquire the property. Without STB authorization, however, the City would, if the track is

indeed "railroad line," be preempted and could not lawfully acquire the property. *See* 49 U.S.C. § 10501(b).

The City contends that it is injured because Conrail's refusal to seek STB abandonment authority has deprived it of these protections. Given this, and given that for purposes of standing we must assume that Conrail needs STB authorization before abandoning the property, we have little trouble concluding that the City enjoys Article III standing. Conrail's refusal to invoke STB proceedings injures the City by depriving it of the benefits of those proceedings—namely, the opportunity to acquire or protect the property—and the City's injury can be redressed by a district court ruling that the Embankment qualifies as "railroad line" that Conrail may not abandon without STB approval.

Insisting that the City nonetheless lacks standing, Conrail argues that the City failed to express a sufficiently "firm intention" to purchase the Embankment. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (plaintiffs' affidavit did not assert "any firm intention to visit" locations where government might damage forests). It argues that nowhere in the City's declarations is there any commitment to acquire the property; instead, the City has demonstrated only a vague desire that it "wants" to acquire the property at some point in the future. This, Conrail argues, is insufficiently concrete to support Article III standing.

This argument gives short shrift to the record before us. Not only does the record contain affidavits from the City's Mayor and City Planning Director declaring the City's strong interest in acquiring and preserving the Embankment, but the City passed an ordinance providing that "[t]he Corporation Counsel of the City of Jersey City . . . and the Business Administrator are *authorized and directed* to undertake any

actions and execute any documents necessary or appropriate to acquire the property either by purchase or condemnation in accordance with [New Jersey law]." Ordinance of Jersey City, N.J. 04-096. The City even hired an eminent domain attorney to pursue available state remedies. Taken together, this evidence is more than sufficient to establish the "substantial probability of imminent injury required for Article III standing." *LaRoque*, 650 F.3d at 788 (internal quotation marks omitted) (finding that a candidate's "allegation [in April 2010] that he intended to run in the November 2011 election and his public announcement at the press conference" were sufficient to establish imminence).

Next, Conrail argues that even if the City had a firm intention of acquiring the property, its injury is "self-inflicted," Appellees' Br. 22, because it twice declined to bid on the property. But the fact that the City could have purchased the property in no way absolves Conrail of its legal duty—which, again, we must assume for purposes of standing—to seek STB authority to abandon the Harsimus Branch before selling it to the LLCs.

The City's injury is also self-inflicted, Conrail argues, because "the only impediment to the City's ability to initiate condemnation proceedings is its own litigation posture." *Id.* at 23. But the City's "litigation posture" represents its good faith position, based on the advice of counsel, that Conrail must obtain STB abandonment authority before the City may lawfully acquire or condemn the Harsimus Embankment. Of course, Conrail has a different "litigation posture": it argues, also in good faith and on the advice of counsel, that no such abandonment authority is necessary. This debate, however, is about the merits of the issue the City seeks to litigate and has nothing at all to do with whether the City has Article III standing. That question turns solely on whether, assuming the

validity of the City's position, Conrail's refusal to seek STB abandonment authority injures the City and whether that injury is traceable to Conrail's refusal and redressable by the court. As explained above, all three requirements are satisfied.

Putting a slight twist on its argument, Conrail claims that the City should seize the property anyway and that even if such an action is unlawful, the City would suffer no concrete injury because it has not "identified anyone who could reasonably be expected to attack the City's title on the basis of the jurisdictional status of the property." *Id.* at 26 (emphasis omitted). To be sure, when plaintiffs sue to void criminal statutes, we require a credible threat of prosecution to satisfy the imminence element of Article III standing. *See Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997); *Seegars v. Ashcroft*, 396 F.3d 1248 (D.C. Cir. 2005). But here the City does not seek to challenge a criminal statute that may never be applied to it. Instead, suing under a federal statute that offers it an array of rights and benefits, it seeks to void an allegedly unlawful sale of railroad line that threatens its interests in the historic and environmental value of that property. In that context, the City's refusal to invade federal jurisdiction and engage in unlawful self-help can hardly deprive it of standing. *Cf. Shays v. FEC*, 414 F.3d 76, 89 (D.C. Cir. 2005) ("But because being put to the choice of either violating BCRA or suffering disadvantage in their campaigns is itself a predicament the statute spares them, having to make that choice constitutes Article III injury.").

## III.

For the foregoing reasons, we reverse and remand for further proceedings consistent with this opinion.

*So ordered.*